UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADI RAVIV,

                          Plaintiff,

           -against-

MIRROR BIOLOGICS, INC.,

                     Defendant.

Case No.:

**COMPLAINT AND
JURY DEMAND**

Plaintiff Adi Raviv ("Plaintiff"), for his complaint against defendant Mirror Biologics, Inc. ("Defendant" or "Mirror"), states as follows:

## SUMMARY OF CLAIMS

1.      This case presents a very straightforward claim for breach of contract.

2.      For approximately ten months, Plaintiff served as an executive of Mirror, a Florida-based clinical stage biopharmaceutical research company focused on the development of next-generation immunomodulatory cancer vaccines and immunotherapy treatments.  As set forth below, in early May 2021, Plaintiff started at Mirror as its interim CEO, pursuant to a consulting agreement.

3.      In January 2022, as set forth in an employment agreement unanimously approved by Mirror's Board of Directors (the "Board"), Plaintiff became Mirror's President and CEO.

4.      Unfortunately, not long thereafter, Mirror decided to part ways with Plaintiff, for reasons still not clear to him.

5.      Under the governing employment agreement, Mirror had the right to terminate Plaintiff's employment without Cause (a term described in more detail below).

6.     Pursuant to that employment agreement, upon a termination without Cause, which is what occurred here, Mirror was required to make certain payments to Plaintiff and to fully vest him in stock previously granted to him.

7.     Mirror has made no such payments, nor has it vested Plaintiff in the stock as described, placing Mirror squarely in breach of the employment agreement.

8.     In addition, the employment agreement fully vested Plaintiff in certain stock options that were previously granted to him, options which have still not been made the subject of a stock option agreement as required.  By failing to document these options, Mirror is also in breach of contract.

## THE PARTIES

9.     Plaintiff is a citizen of New York.

10.    Upon information and belief, Defendant is a Delaware corporation with its principal place of business in Florida.

## JURISDICTION AND VENUE

11.    This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2), and 28 U.S.C. § 1391(c)(2), because: (i) Mirror contractually consented to the personal and subject matter jurisdiction of this Court, rendering Mirror a resident of the Southern District of New York for venue purposes; and (ii) a substantial part of the events or occurrences giving rise to the claim occurred in this district.

99481.3

**FACTS**

**Michael Har-Noy, f/k/a Micheal Gruenberg**

13.     Mirror was founded in 2018 by Michael Har-Noy ("Har-Noy").

14.     Upon information and belief, "Michael Har-Noy" was not Har-Noy's original name.  Rather, Har-Noy was originally named "Micheal Gruenberg".   Upon further information and belief, as "Micheal Gruenberg", Har-Noy was convicted of various counts of mail fraud, wire fraud and securities fraud in 1990.  Upon further information and belief, at some point following his release from prison in November 1994, Har-Noy changed his name from "Micheal Gruenberg" to "Michael Har-Noy".

15.     Upon Mirror's founding in 2018, its sole shareholder was a company called Immunovative Therapies Ltd. ("Immunovative"), which Har-Noy claimed he owned and controlled, a question which Plaintiff understands is the subject of pending litigation in Israel.

16.     The technology being exploited by Mirror in developing the cancer vaccines and immunotherapy treatments was owned by Har-Noy and/or Immunovative, and was licensed to Mirror by Har-Noy and Immunovative.

17.     As a result of Har-Noy's claim of control of Immunovative and claim of ownership, along with Immunovative, of the technology being licensed to Mirror, Har-Noy has substantial influence over Mirror's business.

**The Consulting Agreement**

18.     On May 5, 2021, a consulting agreement was entered into by and among Plaintiff, Mirror and an entity called HTI Associates LLC ("HTI") (the "Consulting Agreement").  HTI is a single-member LLC wholly owned by Plaintiff.

99481.3

19.     At the time that the Consulting Agreement was signed, Har-Noy was a member of the Board and its Acting Chairman.

20.     Pursuant to Section 1 of the Consulting Agreement, Plaintiff became the "Interim Chief Executive Officer" of Mirror, reporting to the Board.

21.     Pursuant to Section 5(b) of the Consulting Agreement: (i) Mirror agreed to grant Plaintiff options to purchase 1,229 shares of Mirror (the "Stock Options"); (ii) the Stock Options were to be at an exercise price of $2,000 per share, with an exercise window of five years; (iii) the Stock Options were to "be evidenced by a separate stock option agreement between" Plaintiff and Mirror; and (iv) the Stock Options would vest in part over time and in part based on Mirror's achievement of certain conditions.

22.     At no time did Mirror ever provide Plaintiff with a stock option agreement as described above.

23.     In July 2021, Har-Noy resigned from the Board and as Mirror's Acting Chairman. From that point through the termination of Plaintiff's employment by Mirror on February 24, 2022 (as described below), Har-Noy was neither an employee nor Board member of Mirror.

**Issues Related to Mirror's Bank Account**

24.     During the fall of 2021, Plaintiff, along with Mirror's then-Chief Financial Officer, William Gilmour, attempted to have themselves added as signatories on Mirror's existing bank account at Bank of America.  At the time, the only signatory on the account was Thu Bui, who had no affiliation with Mirror but who was Har-Noy's wife.

25.     Plaintiff's and Mr. Gilmour's efforts to add themselves as signatories were unsuccessful, based on the fact that Mirror had been registered to do business in Florida and

99481.3

because Plaintiff and Mr. Gilmour had not yet been added to Mirror's list of executive officers on file with Florida's Division of Corporations.

26.     As a result, Plaintiff – Mirror's Interim CEO – became increasingly concerned about the fact that the sole signatory on the lone corporate bank account was someone (Ms. Bui) who had no affiliation with Mirror and whose husband was a convicted fraudster.

27.     Accordingly, and in Mirror's best interests, Plaintiff caused Mirror to open new corporate bank accounts at JP Morgan Chase in New York, on which accounts Plaintiff was temporarily the sole signatory, with the understanding that upon confirmation of Mirror's soon-to-be-named Chairman and new CFO, those two individuals would be added as signatories.

28.     On December 13, 2021, Plaintiff instructed Ms. Bui to cause $11.85 million – funds which were invested in Mirror earlier in December – to be wired from Mirror's Bank of America account (on which she was still the sole signatory) into one of the foregoing JP Morgan Chase accounts, which instruction Ms. Bui followed.

29.     Thereafter, neither Har-Noy nor Ms. Bui had any access to Mirror's funds at Chase prior to the termination of Plaintiff's employment by Mirror on February 24, 2022 (as described below).

**The Employment Agreement**

30.      On January 19, 2022, Plaintiff, Mirror and HTI entered into an employment agreement with an effective date of January 1, 2022, pursuant to which Plaintiff would: (i) serve as "President and Chief Executive Officer" of Mirror; (ii) report to the Board; and (iii) serve as a member of the Board (the "Employment Agreement").

31.     Pursuant to Section 1.1 of the Employment Agreement, the parties agreed that: (i) the Consulting Agreement would be deemed terminated as of midnight on December 31, 2021;

99481.3

and (ii) notwithstanding such termination, Mirror would not be released from any of its financial obligations under the Consulting Agreement.

32.     Pursuant to Section 1.3 of the Employment Agreement, the parties agreed that as of December 31, 2021, all unvested Stock Options would "vest fully."

33.     Pursuant to Section 5.1 of the Employment Agreement, Plaintiff was to be paid an annual base salary of no less than $395,000 (the "Base Salary").

34.     Pursuant to Section 5.2 of the Employment Agreement, Plaintiff was eligible for an annual bonus (defined as "Bonus"), and his target Bonus for 2022 was set at 60% of his Base Salary (*i.e.*, $237,000).

35.     Pursuant to Section 5.4 of the Employment Agreement, Plaintiff was granted 2,000 shares of capital stock of Mirror (the "Grant Shares"), which would vest over time pursuant to a stated schedule.  Upon information and belief, the current fair market value of the Grant Shares is at least $4,000,000.

36.     Pursuant to Section 6.3 of the Employment Agreement, Mirror was entitled to terminate Plaintiff's employment for "Cause" (as defined), "with the approval of the majority of the Board" and "upon written notice by the Board to" Plaintiff.  This Section 6.3 also required, as a condition to a termination of Plaintiff's employment for Cause, that Mirror provide Plaintiff with "written notice of any condition reasonably believed to constitute Cause . . . which adequately details such Cause [and] the basis for the Company's belief that Cause exists."

37.     Pursuant to Section 6.4 of the Employment Agreement,  Mirror was entitled to terminate Plaintiff's employment without Cause, at any time and without prior notice.

38.     Pursuant to Section 7.2 of the Employment Agreement, if Plaintiff's employment was terminated without Cause, he was entitled to be paid the following (among other things),

subject to his having given Mirror a general release in a reasonably acceptable form:  (i) a pro

rata Bonus for the year of termination; (ii) continued payment of Base Salary for twelve months;

(iii) immediate vesting of all unvested Grant Shares; and (iv) for up to twelve months, COBRA

premium reimbursement.

39.     At a Board meeting held on January 19, 2022, the Board unanimously approved

the Employment Agreement.  As the minutes of this meeting reflect, the Employment

Agreement:  (i) had first been reviewed by Mirror's outside counsel "to make sure that it was in

the Company's interests"; and (ii) was "presented to the Board for consideration" before the

foregoing unanimous approval of same by the Board.

**Mirror's Termination of Plaintiff's Employment**

40.     On February 24, 2022, six of seven Board members were formally terminated,

and the sole remaining director appointed four new directors to the Board, one of whom was

Har-Noy.  Immediately thereafter, the new Board voted to remove Plaintiff as the President and

Chief Executive Officer of Mirror – positions which he only held pursuant to the Employment

Agreement.  The "Unanimous Consent of Directors" reflecting this decision does not reference

the Employment Agreement, nor does it state that Plaintiff's employment by Mirror was being

terminated for Cause.

41.     Upon information and belief, Har-Noy, who had great influence over Mirror's

new Board for unknown reasons, convinced Mirror's shareholders to replace the majority of the

Board, as described above, and then have the new Board terminate Plaintiff's employment.

42.     Upon further information and belief, the primary impetuses for Har-Noy's actions

in this regard were:  (i) Plaintiff having moved almost $12 million out of Har-Noy's control (via

his wife, Ms. Bui); and (ii) Plaintiff's refusal to accept Har-Noy's strategic plans without Board

99481.3

discussion and approval (which included payment of Mirror funds to other companies owned by Har-Noy).

43.     Upon further information and belief, the termination of Plaintiff's employment and reconstitution of the Board provided Har-Noy and certain shareholders with other potential benefits, such as:  (i) more favorable terms on previously-signed distribution agreements and promised ones to be entered into in the future; and (ii) more favorable dilution terms of their shareholdings without Board discussion and approval.

44.     Later on February 24, 2022, Mirror's outside counsel, Aaron Sims of the law firm of Potter Anderson & Corroon LLP, sent a letter to Plaintiff's counsel, enclosing the foregoing consent and stating that pursuant thereto, "Mr. Adi Raviv's employment as President and Chief Executive Officer of the Company has been terminated, effective immediately."  Nowhere in this written termination letter did Mirror assert that Plaintiff's employment by Mirror was being terminated for Cause under the Employment Agreement.  Nor did Mirror provide Plaintiff with "written notice of any condition reasonably believed to constitute Cause . . . which adequately details such Cause [and] the basis for [Mirror's] belief that Cause exists," as required by Section 6.3 of the Employment Agreement.

45.     Mirror has not provided Plaintiff with any proposed general release pursuant to Section 7.2 of the Employment Agreement.  Nor has Mirror provided Plaintiff with any of the without Cause payments and benefits described in that section and in Paragraph 38 above.

## FIRST CLAIM
### (Breach of Contract)

46.     Plaintiff repeats and realleges the allegations set forth in Paragraph 1 through 45 above.

47.     Both the Consulting Agreement and the Employment Agreement are binding and enforceable contracts between Plaintiff and Mirror.

48.     By failing to memorialize the grant of the Stock Options via a stock option agreement, Mirror breached the Employment Agreement.

49.     Upon information and belief, Mirror denies that Plaintiff is fully vested in the Stock Options.  To the extent that Mirror denies that Plaintiff is fully vested in the Stock Options, Mirror is in breach of the Employment Agreement.

50.     Mirror terminated Plaintiff's employment without Cause under the Employment Agreement.  This conclusion is required not only because there was no basis for a termination for Cause, but also because Mirror failed to provide the required written notice of any condition that it reasonably believed constituted Cause or to detail such Cause.

51.     By failing to provide Plaintiff with the payments and benefits required by Section 7.2 of the Employment Agreement, including full vesting of the Grant Shares, Mirror breached the Employment Agreement.

52.     As a direct and proximate result of the foregoing breaches by Mirror, Plaintiff has been damaged in an amount to be proven at trial, which is expected to be no less than $5,000,000.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury of his claims.

99481.3

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

    a.  On Plaintiff's First Cause of Action, for an order:

        (i)  compelling Mirror to memorialize the fully vested Stock Options in accordance with the Consulting Agreement and the Employment Agreement;

        (ii) awarding Plaintiff an amount be proven at trial, which is currently believed to be no less than $5,000,000; and

    b.  Awarding Plaintiff such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 11, 2022

                      BERGER WEBB HONE & ROGIN, LLP

                      By: _____
                            Jonathan Rogin (JR-9800)

                      *Attorneys for Plaintiff*
                      7 Times Square, 27th Floor
                      New York, New York 10036
                      212-319-1900
                      jrogin@bergerwebb.com

99481.3