UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADI RAVIV,

                                   Plaintiff,

          -v-

MIRROR BIOLOGICS, INC.,

                                   Defendant.

CIVIL ACTION NO.: Civ. 22 Civ. 6847 (SLC)

**OPINION & ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

## I. INTRODUCTION

This action arises out of the work that Plaintiff Adi Raviv ("Mr. Raviv") performed first as a consultant and later as President and Chief Executive Officer ("CEO") of Defendant Mirror Biologics, Inc. ("Mirror" or the "Company"), a clinical stage immunotherapy company founded by Dr. Michael Har-Noy ("Dr. Har-Noy"). The parties dispute whether an employment agreement between Mr. Raviv and Mirror existed, and if so, whether Mirror validly dismissed Mr. Raviv "for cause" in February 2022.

During a three-day bench trial on Mr. Raviv's breach of contract claim against Mirror,[1] some facts were undisputed, but many material facts turned on the Court's assessment of the witnesses' credibility, including the Court's examination of their demeanor. Based on these assessments, the admitted evidence (including live testimony, deposition excerpts, and

---

[1] The parties consented to the jurisdiction of a Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636. (ECF Nos. 9–10).

documentary exhibits), and post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[2]

## II. BACKGROUND

The Court makes the following findings of fact after thoroughly and carefully considering the evidence at trial.

### A. Mirror

In November 2018, Dr. Har-Noy founded Mirror, a Delaware "clinical stage immunotherapy company" with its principal office in Florida. (ECF Nos. 1 ¶¶ 10, 13; 12 ¶¶ 10, 14; 56 at 96; 58 at 7; PxN at AR-002744).[3] At that time, Dr. Har-Noy was Mirror's sole shareholder and director. (ECF No. 56 at 96, 121). Dr. Har-Noy, who holds a Ph.D. in bioengineering, was the sole inventor of over 200 patented technologies in the field of immunotherapy for the treatment and prevention of cancer and other diseases (the "Patents"). (ECF Nos. 52 at 10; 56 at 95; PxN at AR-002749; Dx11 at 0010888). Dr. Har-Noy was an initial investor in Immunovative Therapies, Ltd. ("Immunovative"), of which he holds just under 20% of shares, and its wholly owned subsidiary, ImmunoCare Therapies ("ImmunoCare"), both Israeli companies that also hold Mirror shares. (ECF No. 56 at 95–97).

On August 20, 2021, Dr. Har-Noy assigned his rights in the Patents to Mirror (Dx11 at 0010888–95), and, pursuant to a consulting agreement between Mirror and Immunovative,

---

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[3] The Court refers to Mr. Raviv's trial exhibits with the prefix "Px" and to Mirror's exhibits with the prefix "Dx."

provided services to Mirror while maintaining operational control over Mirror's research, clinical trials, manufacturing, and regulatory affairs.  (Dx11 at 0010897–907; ECF No. 55 ¶ 3).

Through his personal Mirror shareholdings as well as his interests in Immunovative and ImmunoCare, Dr. Har-Noy controlled a majority of the voting shares of Mirror until December 2021.  (ECF No. 56 at 97–98).  Dr. Har-Noy estimated that Mirror needed more than $150 million in capital to bring a drug to market.  (ECF No. 56 at 101–02).  To obtain this capital, Mirror sought additional financing to pursue an initial public offering ("IPO").  (ECF Nos. 52 at 14–15; 56 at 102; PxM at AR-015204).  In April 2021, Mirror engaged the law firm of Carmel, Milazzo & Feil LLP ("CMF") to provide advice in connection with preparing for an IPO.  (PxF at AR-015312–18).  In the retainer agreement with CMF, Mirror agreed to pay CMF a cash retainer of $15,000, pay CMF's hourly billing rates, and grant CMF 1,229 shares of Mirror common stock.  (PxF at AR015312–13 (the "CMF Engagement Letter"); ECF No. 56 at 234–35).  Dr. Har-Noy also appointed Todd Wallach ("Mr. Wallach") to serve as interim CEO and a member of Mirror's board of directors.  (ECF Nos. 52 at 8; 56 at 103).

### B.  The Raviv Consulting Agreement

Mr. Raviv received his bachelor's degree from Hebrew University of Jerusalem and his M.B.A. from Columbia University School of Business.  (ECF No. 52 at 4).  Since 1987, he has worked in investment banking in the technology, healthcare, and emerging growth sectors, co-founded a publicly-traded merchant bank and advisory firm, served as the chief financial officer of public and private companies, was the chief operating officer of a family office, and held several board and advisory positions in the healthcare sector.  (Id. at 4–5).  Mr. Raviv is the sole owner of HTI Associates, LLC ("HTI"), a consulting firm.  (Id. at 14).

Following a disagreement with Dr. Har-Noy, Mr. Wallach was removed as CEO but remained a director.  (ECF Nos. 52 at 8; 56 at 103, 114).  Dr. Har-Noy, who remained Mirror's majority shareholder and a member of its board of directors, then approached Mr. Raviv about becoming Mirror's interim CEO.  (ECF No. 52 at 8, 11, 14–15).  The other two members of Mirror's board at this time were Mr. Wallach and Patrick Tan ("Mr. Tan"), who lived and raised funds for Mirror in Malaysia.  (ECF No. 52 at 16–18).  Mr. Tan also had an interest in a company that served as Mirror's Southeast Asia distributor, and thus was not an independent director.  (ECF Nos. 52 at 92, 99; 56 at 56, 92; see Dx59).[4]

On May 5, 2021, Mirror retained Mr. Raviv and HTI as consultants pursuant to a consulting agreement (the "Raviv Consulting Agreement") for an initial term of five months, during which Mr. Raviv was to serve as Mirror's Interim CEO and a member of its board of directors—increasing the number of directors to four—and "devote the majority of his time and attention to the affairs of" Mirror in exchange for a monthly fee of $10,000.  (PxD at 1–2; ECF No. 52 at 13–15, 17).[5]  The Raviv Consulting Agreement—which Dr. Har-Noy executed as "Chairman" of Mirror and without a shareholder vote—noted that Mirror's "primary objective in retaining HTI and [Mr. Raviv was] to utilize [his] knowledge and experience in capital markets, positioning a company for a financing and managing a company's preparation and filing of an S-1 Registration Statement with the Securities and Exchange Commission" (the "SEC").  (PxD at 1, 8; ECF No. 52 at 14).

---

[4] See New Enter. Assoc. 14, L.P. v. Rich, 292 A.3d 112, 161 (Del. Ct. Ch. 2023) ("For a director to be disinterested, the director can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.") (citation omitted).

[5] Mr. Raviv and Dr. Har-Noy both executed the Raviv Consulting Agreement on May 7, 2021.  (PxD at 12–13).

The Raviv Consulting Agreement's "Salary and Incentives" provision contemplated that: (i) on "the earlier of the Bridge Financing Event [financing(s) of $3,000,000 or greater] or the end of the fifth (5) Successive Term (monthly)," the monthly fee would increase to $15,000, and after seven months, to $17,500; (ii) Mr. Raviv would be granted options to purchase up to 1,229 shares of Mirror's common stock "on a fully diluted basis," with 230 shares vesting over the first five months (or 46 shares per month), 570 shares vesting if the Bridge Financing Event closed within twelve months, and 429 shares vesting if either the SEC declared Mirror's registration statement effective and an IPO of $15 million closed, or another financing of $15 million was completed (the "Stock Options"); and (iii) Mirror would reimburse Mr. Raviv and HTI on a regular basis for expenses "approved in advance and in accordance with [its] current practices [for which Raviv] properly account[ed.]" (PxD at 1–3). Mr. Raviv's options were at an exercise price of $2,000 per share with an expiration date of five years from the date of grant, but any shares not vested at the time of termination of the Raviv Consulting Agreement "shall be cancelled." (PxD at 3 nn.2–3). Thus, while the Raviv Consulting Agreement provided various incentives or "performance milestones" to Mr. Raviv in the event of successful financing or an IPO (ECF No. 56 at 212), it did not promise or guarantee that either such event would, in fact, occur. (ECF No. 52 at 15).[6] Neither the Bridge Financing Event, the S-1 registration statement, nor $15 million in other financing occurred, during the initial five-month term or thereafter. (ECF Nos. 52 at 156; 56 at 211–12).

---

[6] In this regard, the Court rejects as self-serving and not credible Dr. Har-Noy's testimony that the Raviv Consulting Agreement "required" Mr. Raviv to "raise bridge financing" of "$5 million" and "register under an S1[.]" (ECF No. 56 at 211–12).

The Raviv Consulting Agreement contained a termination provision permitting Mirror, HTI, or Mr. Raviv to terminate "at any time with fourteen (14) days written notice," in which case Mirror agreed to "provide HTI and [Mr. Raviv] with all accrued compensation, and benefits through the effective date of termination."  (PxD at 3).  The Raviv Consulting Agreement also permitted Mirror, subject to a fourteen-day cure period, to "immediately terminate [Mr. Raviv's] engagement at any time for Cause by giving written notice to HTI and [Mr. Raviv] specifying in reasonable detail the reason for such termination."  (Id.).  The Raviv Consulting Agreement defined "Cause" to mean that Mr. Raviv:

> willfully engages in an act or omission which is in bad faith and to the detriment of the Company; engages in gross misconduct, gross negligence, or willful malfeasance, in each case that causes material harm to the Company; breaches this Agreement in any material respect; habitually neglects or materially fails to perform his duties (other than any such failure resulting solely from [his] physical or mental disability or incapacity) after a written demand for substantial performance improvement is delivered to [him] which identifies the manner in which the Company believes that [he] has not performed [his] duties; is convicted of a felony or any crime involving moral turpitude; uses drugs or alcohol in a way that either interferes with the performance of his duties or compromises the integrity or reputation of the Company; engages in any act of dishonesty involving the Company; discloses the Company's confidential information not required by applicable law; [is] convicted of commercial bribery or the perpetration of fraud against the Company.

(Id. at 4).  In the event of a for-cause termination, Mr. Raviv and HTI were only "entitled to payment of all accrued and unpaid compensation and wages" and had "no right to compensation or benefits for any period subsequent to the effective date of termination."  (Id.).

The Raviv Consulting Agreement attached and incorporated a non-disclosure agreement (the "NDA"), pursuant to which Mr. Raviv agreed not to disclose "to anyone outside of" Mirror or use "for any purpose other than the performance of [his] duties as a consultant or an employee of" Mirror any "Proprietary Information," which was defined as "all information . . . concerning

[its] business, technology, business relationships, or financial affairs that [it] has not released to the general public[.]"  (PxD at 2, 9).  Mr. Raviv agreed that, if he violated the NDA, in addition to all other remedies available to Mirror, he was obligated to pay Mirror's costs of enforcement of the NDA, including reasonable attorneys' fees and costs.  (Id. at 10–11).

Finally, the Raviv Consulting Agreement provided that it could be extended on a monthly basis, or converted to an employment agreement after one year, i.e., after May 5, 2022, but that it could only be "terminated, amended, supplemented, waived, or modified [] by an instrument in writing, signed by the Party against whom the enforcement of the termination, amendment, supplement, waiver, or modification is sought."  (PxD at 1, 2, 7).[7]

### C.  Mirror's Evolving Board of Directors

When Dr. Har-Noy founded Mirror in 2018, the Company did not "have any founding documents or bylaws."  (ECF No. 56 at 121).  In May 2019, Dr. Har-Noy engaged an attorney to prepare "initial corporate governance documents," pursuant to which he understood the number of directors to be "fixed at three."  (Id. at 121–22).  In a unanimous written consent executed in January 2020, Dr. Har-Noy, then Mirror's sole director, resolved that Mirror's "authorized number of directors be initially set at a minimum of one and a maximum of seven[,]" and appointed as additional directors Mr. Tan and Dr. Lim Teck Onn ("Dr. Onn"), bringing the number of directors to three.  (PxM at AR-015088, AR-015149–59; ECF No. 56 at 121–22; see PxYY at AR-000306 (the "2020 By-Laws")).  The 2020 By-Laws permitted board vacancies to "be filled by the Chairman of the Board of Directors, or by a sole remaining director[.]"  (PxYY at

---

[7] The Raviv Consulting Agreement also contained a Delaware choice of law clause, which Mirror appears to have overlooked.  (PxD at 7; see n.28, infra).

AR-000307).  After Dr. Onn was "asked . . . to resign," Mr. Wallach, then interim CEO, was made a director.  (ECF No. 56 at 114).

On July 2, 2021, Dr. Har-Noy resigned as Chairman and a member of the board of directors, at which time he no longer had an official title at Mirror.  (PxE; ECF Nos. 52 at 24–25; 56 at 102).  Dr. Har-Noy resigned without objection after Mr. Raviv told him that, for Mirror to conduct an IPO, he "could not be an officer or director of the [C]ompany because of [his] past criminal conviction[,]" and he did not "want[] to interrupt the [C]ompany's progress toward[ an] IPO[.]"  (ECF No. 56 at 102; see ECF No. 52 at 24).  In a unanimous written consent executed on August 21, 2021 (the "Aug. 21 UWC"), Mirror's board of directors—consisting only of Mr. Tan and Mr. Wallach—appointed Mr. Raviv CEO and Chairman, making him the third member of the board of directors (the "Three Member Board").  (Dx5; ECF No. 56 at 104).

Pursuant to a unanimous written consent executed on August 22, 2021, the Three Member Board approved a consulting agreement with Immunovative (the "Immunovative Consulting Agreement"), which was the mechanism by which Dr. Har-Noy served as a consultant and exercised "control" over Mirror's "operations related to clinical trials, regulatory affairs, research and development, and manufacturing."  (Dx11 at 0010870–885; ECF No. 56 at 106–107). Dr. Har-Noy and his wife, Thui Bui ("Ms. Bui"), were to be paid $663,600 annually, and once Mirror obtained $3 million in financing, on a pro rata quarterly basis.  (Dx11 at 0010877; ECF No. 56 at 109).  Previously, Dr. Har-Noy had been paid "around $5,000 a month" and Ms. Bui had been paid $100,000 annually for providing the same services to Mirror.  (ECF No. 56 at 110–11).  In conjunction with the Immunovative Consulting Agreement, the Three Member

Board also approved Dr. Har-Noy's assignment to Mirror of all his rights and liabilities with respect to the Patents.  (Dx11 at 0010888–94).

On October 29, 2021, Dr. Har-Noy, as Mirror's majority shareholder, approved amendments to its certificate of reincorporation (the "2021 Amended COI") and to the 2020 By-Laws (the "2021 By-Laws").  (PxHH; PxI).  The 2021 Amended COI provided that "[t]he number of directors which will constitute the whole Board of Directors will be fixed by the Board of Directors in the manner provided in the" 2021 By-Laws.  (PxI at AR-015059–60).  The 2021 By-Laws in turn provided that "[t]he authorized number of directors of [Mirror] shall be fixed by the Board of Directors from time to time[,]" and that:

> any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall, unless the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by stockholders, be filled only by the affirmative vote of a majority of directors then in office, even though less than a quorum of the Board of Directors, or by a sole remaining director[.]"

(Id. at AR-015068–69).  Under the 2021 By-Laws, as CEO, Mr. Raviv, "subject to the control of the Board of Directors, ha[d] general supervision, direction and control of the business and officers of the corporation" and was empowered to "perform other duties commonly incident to the office and [] such other duties and have such other powers as the Board of Directors shall designate from time to time."  (Id. at AR-015072 § 5.2(c)).[8]  Mr. Raviv caused the 2021 Amended COI to be filed with the Delaware Secretary of State.  (ECF No. 52 at 48–49; PxK).

---

[8] The 2021 By-Laws contain two provisions labeled "Section 5.2".  (Compare PxI at AR-010572 ("Section 5.2 Tenure and Duties of Officers") with PxI at AR-015073 ("Section 5.2 Delegation of Authority")).  The Court's citation is to the former.

Mr. Raviv then sought to recruit "several credible board members . . . that had experience with pharmaceuticals/biotech companies that took a drug from R&D through clinical trial stages to the market, and that would give credibility to the potential institutional investors that would . . . serve [Mirror] in marketing the [C]ompany to investors and in an S1 document to an IPO."  (ECF No. 52 at 31).  Mr. Raviv informed Dr. Har-Noy of his recruitment efforts, and Dr. Har-Noy did not voice any objection to increasing the number of directors.  (Id. at 31–32).  Mr. Raviv discussed with Dr. Har-Noy potential board memberships of Joel Kanter ("Mr. Kanter"), Alessandra Cesano ("Dr. Cesano"), Nicole Lemerond ("Ms. Lemerond"), Nava Swersky ("Ms. Swersky"), and Yael Margolin ("Dr. Margolin").  (Id. at 31–37; see ECF No. 56 at 137–43).  Dr. Har-Noy met with both Dr. Margolin and Mr. Kanter, whose directorships he supported, and suggested to Mr. Raviv that Dr. Cesano, who served on Mirror's scientific advisory board, become a director.  (ECF Nos. 52 at 32–33; 56 at 137–42).

On December 13, 2021, Mr. Raviv circulated to Mr. Kanter, Ms. Lemerond, Ms. Swersky, Drs. Cesano and Margolin, and Dr. Har-Noy an email stating that Mr. Kanter had "agreed to become Chairman" of Mirror and describing Ms. Lemerond, Ms. Swersky, and Drs. Cesano and Margolin as potential new directors.  (PxP (the "Dec. 13 Email")).  In response to the Dec. 13 Email, Dr. Har-Noy did not raise any objection or otherwise assert that the addition of these individuals as directors required a shareholder vote.  (ECF Nos. 52 at 50; 56 at 143).  On December 28, 2021, Mr. Raviv sent an email, on which Dr. Har-Noy was copied, asking Mr. Kanter, Ms. Lemerond, Ms. Swersky, and Dr. Cesano to provide short biographies to be included in an anticipated press release "to announce [Mirror's] new expanded board."  (PxCCC (the "Dec. 28 Email")).  When he received the Dec. 28 Email, Dr. Har-Noy understood that these individuals

were being discussed as potential directors if Mirror was going public, "but since apparently [it was not] going public," he believed "there should be no hurry to add these board members." (ECF No. 56 at 226–27).  Dr. Har-Noy did not assert in response to the Dec. 28 Email, however, that shareholder approval was required to add new directors.  (Id. at 229–30).

On December 29, 2021, the Three Member Board executed a unanimous written consent increasing the number of directors to seven and appointing Mr. Kanter, Ms. Lemerond, Ms. Swersky, and Dr. Cesano as directors (the "Seven Member Board"), and Mr. Kanter as Chair. (PxR (the "Dec. 29 UWC"); see ECF No. 52 at 52–53).  Dr. Har-Noy thanked Mr. Raviv for "all this effort" in bringing the new directors to Mirror and acknowledged that Mr. Kanter was Chair. (PxOO at AR-011565; ECF No. 56 at 186).   The Dec. 29 UWC also approved a "proposed employment agreement" with Mr. Raviv,[9] and awarded "a signing bonus loan of $100,000" (the "Loan"), to be "forgiven over 5 years at a rate of 20% per year commencing 01.01.23 without regard to the status of Mr. Raviv's employment hereunder."   (PxR at AR-000016–19). Subsequently, in January 2022, a majority of the Seven Member Board approved paying Mr. Raviv a $100,000 bonus (the "Bonus"), which he planned to use to repay the Loan by the end of the first quarter of 2022 so the Loan would not have to be reflected as a related-party transaction on Mirror's financial statements.  (PxZZ; ECF Nos. 52 at 125; 56 at 39–40, 43–44, 74–75).[10]  Mr. Tan

---

[9] The Dec. 29 UWC referenced an attached "Exhibit A-1" that was a "proposed employment agreement" for Mr. Raviv, but the Dec. 29 UWC admitted into evidence as Exhibit PxR does not attach such a document nor did Mirror otherwise enter it into evidence.  (See ECF No. 52 at 51–52, 120–21).  The Court therefore makes no finding as to and disregards the "proposed employment agreement."

[10] Financial Accounting Standards Board Accounting Standard Codification 850 "'provides disclosure requirements or related party transactions[.]'"  In re Hebron Tech. Co., Ltd. Secs. Litig., No. 20 Civ. 4420 (PAE), 2021 WL 4341500, at *11 (S.D.N.Y. Sept. 22, 2021) (quoting ASC 850-10-05-1, which requires disclosure of descriptions of transactions between the company and, inter alia, members of management).  In addition, federal regulations require publicly traded companies to disclose certain related party transactions.  See 17 C.F.R. § 229.404(a).

and Mr. Wallach were not, however, included on the communications in the record regarding the Bonus.  (PxZZ).

Mr. Tan, who was in Malaysia, signed the Dec. 29 UWC first, and then sent it to Mr. Raviv and Mr. Wallach, who signed through DocuSign.  (ECF No. 52 at 53; PxR at AR-000019–20).  After the execution of the Dec. 29 UWC, Mr. Raviv sent an email, on which Dr. Har-Noy was copied, discussing the anticipated press release announcing the Seven Member Board.  (PxS (the "Dec. 29 Email"); ECF No. 52 at 54).  Following the Dec. 29 Email, Dr. Har-Noy did not object or otherwise assert that shareholder approval of the Seven Member Board was required.  (ECF Nos. 52 at 54; 56 at 150–51).[11]

## D.  The Loo Transaction

On December 6, 2021, Keith Loo ("Mr. Loo"), through his entities Bradbury Private Investment XIII, Inc. ("Bradbury") and Bottania Algo Trading Strategy II Inc. ("Botannia"), invested $11.4 million in exchange for 5,700 shares of Mirror's common stock at $2,000 per share (the "Loo Transaction").  (PxQ at 000064–65; Dx19; Dx20; ECF Nos. 52 at 38–39, 168–70; 56 at 98).  As a result of the Loo Transaction, which was memorialized in securities purchase agreements ("SPAs") (Dx19; Dx20; ECF No. 52 at 168–69), Dr. Har-Noy was no longer Mirror's majority shareholder.  (ECF No. 56 at 98).  After the Loo Transaction closed, Dr. Har-Noy told Mr. Raviv:

> [I] am so honored to be associated with you as a partner and friend.  The closing of [the Loo Transaction] is a major milestone in the AlloStim story.  You sure make me look good (almost like I knew what I was doing) when recruiting you, after

[11] Despite being approved, Ms. Swersky went "radio silent" and never actually took her seat, but was replaced by Dr. Margolin at the January 19, 2022 meeting, discussed in section II.G.2, infra.  (PxAA at 1; ECF Nos. 52 at 87; 56 at 23).  Thus, the Seven Member Board refers to Mr. Raviv, Mr. Kanter, Mr. Tan, Mr. Wallach, Ms. Lemerond, Dr. Cesano, and Dr. Margolin.  (PxAA at 1).

several stumbles with my former CEO picks.   Financing Mirror was and will continue to be a real challenge. . . . These early investors are as much investing in you as they are [in] the technology[.]   Success breeds success.   You are a winner and that attracts winners. . . . I knew I couldn't do it myself, Had [sic] to turn the reigns over to someone with the skills and integrity to bring us to the finish line.

(PxJJJ at 0014013; ECF No. 56 at 195).

### E.   Mirror's Bank Accounts

Beginning in 2018, Ms. Bui managed, initially as a consultant and later as an employee, Mirror's bank account at Bank of America (the "BoA Account").  (ECF No. 58 at 8–10).  Dr. Har-Noy and Ms. Bui were the signatories on the BoA Account.  (ECF No. 58 at 10; see ECF No. 52 at 103).  In July 2021, after Mr. Raviv became interim CEO, he asked Ms. Bui to add him as a signatory on the BoA account so he could "view and authorize transactions[.]"  (Dx7).  To be a signatory on the BoA Account, Mr. Raviv needed to (i) register as an officer with Sunbiz, the business entity index maintained by the State of Florida Division of Corporations,[12] and (ii) appear in person at the Florida branch where the BoA Account was located.  (ECF Nos. 52 at 223; 58 at 14).  On July 21, 2021, Ms. Bui sent Mr. Raviv the forms necessary to register for Sunbiz and become a signatory on the BoA Account.  (ECF No. 58 at 15–16).  Although by September 30, 2021, Mr. Raviv had not yet returned the forms (Dx12), he did so sometime between that date and October 25, 2021, when Ms. Bui applied to register Mr. Raviv with Sunbiz, the approval of which came on November 3, 2021.  (ECF No. 58 at 15; Dx74).[13]  On November 3, 2021, Mr. Raviv and

---

[12] See https://dos.fl.gov/sunbiz/ (last visited May 31, 2024).
[13] The Court deems not credible Ms. Bui's testimony that Mr. Raviv never returned the forms (ECF No. 58 at 16), given her prior admission  that she successfully applied to register him for Sunbiz (id. at 14–15), which could not have occurred without him having executed the required forms.  (See Dx74).

Mirror's CFO, Bill Gilmour, went to the BoA branch in Florida, but were not "able to get onto the bank account as signatories that day[.]"  (ECF No. 52 at 103, 223–24).

On October 7, 2021—during the period when he lacked access to the BoA Account— Mr. Raviv contacted Daniel Mbengue ("Mr. Mbengue"), at Chase Private Bank in New York ("Chase"), seeking to open an account for Mirror to which Mr. Raviv, Mirror's CFO, and Ms. Bui would have access.  (PxH ("What do I need to do to open the account and authorize me, my CFO and office manager in Florida with access to transact on various amounts with authorized approvals[?]"); ECF No. 52 at 104–05, 109).  On December 6, 2021, Mr. Raviv provided to Mr. Mbengue Mirror's certificate of incorporation and 2021 By-Laws, the Aug. 21 UWC, portions of a draft prospectus, and a breakdown of Mirror's shareholders that listed, inter alia, Dr. Har-Noy as holding 15% of Mirror's shares.  (PxN at AR-002714).  Mr. Raviv did not state that he was Mirror's sole owner or held any Mirror shares at all.  (PxN at AR-002714; ECF No. 52 at 111–12).  On December 8, 2021, Mr. Raviv opened an account on Mirror's behalf at Chase (the "Chase Account")).  (Dx24 at 1; ECF No. 52 at 230).[14]  In addition to Mr. Raviv, Brio Financial ("Brio"), the financial services firm that Mirror had engaged to perform bookkeeping and accounting functions until Mirror installed a CFO, also had access to the Chase Account.  (ECF No. 52 at 116–17; PxDDD).

On December 12, 2021, Mr. Raviv instructed Ms. Bui—by email copied to Dr. Har-Noy— to "transfer $11.85 million"—a substantial portion of the proceeds of the Loo Transaction—

---

[14] The Chase Account consisted of two checking accounts and one savings account, to which the Court, and the parties, refer collectively as the Chase Account.  (PxBBB at 0018829).

to the Chase Account.  (Dx25 at 0000391–92; ECF No. 52 at 105).  Mr. Raviv provided Ms. Bui the

Chase Account number and routing information, explaining:

> I cannot have the monies in [the BoA Account] where I (or any other Mirror
> employee) have no access to them.  I spent hours on Friday going back and forth
> with Bank of America and the only way that I could get authorized onto the
> account would be to go to the branch with you in person.  Bizarre.  I may do that
> later this week, but, in the meantime, I would like you to wire those funds to our
> Chase account . . . Starting 1/1/22 we will make all payments out of Chase.  Let's
> make the appropriate transition arrangements. . . . I would still like to maintain
> some money in the [BoA Account] so that you can handle transition and smaller
> payments that need to be made for some time.

(Dx25 at 0000392).  On December 13, 2021, Ms. Bui executed the transfer of $11.85 million from

the BoA Account to the Chase Account.  (Dx24 at 10; ECF No. 58 at 19–20).  Mr. Raviv thanked

her and suggested that Ms. Bui "becom[e] a full-time Mirror employee" because he

"recognize[d]" that she "was very valuable[.]"  (PxGGG at 0000874).  Ms. Bui declined to become

a Mirror employee on the advice of Dr. Har-Noy but provided instructions for recording in

Mirror's books any transactions in the Chase Account.  (Id. at 0000873 ("Michael thinks it is not

a good idea that I be [a] Mirror employee.")).

Mr. Raviv made four transfers from the Chase Account to himself (the "Chase Transfers").

First, on December 20, 2021, Mr. Raviv transferred $25,000 as reimbursement for expenses he

had paid or soon expected to pay on his personal credit card on Mirror's behalf, including Brio's

fees, capital equipment, and employees' travel expenses.  (ECF No. 52 at 233–35; Dx24 at 10).

Mr. Raviv did not itemize these expenses and Ms. Bui, who typically reviewed expense

reimbursements, did not approve them before Mr. Raviv transferred the $25,000 to himself.

(ECF No. 58 at 25–26).  Second, on January 3, 2022, Mr. Raviv transferred $100,000, representing

the Loan that the Seven Member Board had approved in the Dec. 29 UWC.  (PxR at AR-000016;

Dx24 at 15).  Third, on January 21, 2022, Mr. Raviv transferred the $100,000 Bonus to himself, with the intent of using it to repay the Loan by the end of the first quarter of 2022.  (ECF Nos. 52 at 125; 56 at 39–40, 43–44; PxZZ; Dx24 at 15).[15]  Fourth, on February 9, 2022, because he was not yet registered as an employee on Mirror's payroll on ADP, Mr. Raviv transferred $50,833.33, representing his base salary for January and February 2022 (see § II.G.3, infra) less $15,000 he had received for January 2022 under the Raviv Consulting Agreement.  (ECF No. 52 at 119, 121–22; PxDD (January 2022 emails discussing requirements for Mirror to set up ADP payroll); Dx24 at 38).[16]  As of February 1, 2022, the balance in the Chase Account was $10,639,342.10.  (PxBBB at 0018829).

As relevant to the Chase Account, both the 2020 By-Laws and the 2021 By-Laws provided that "[t]he Chief Financial Officer, subject to the order of the Board, shall have the custody of all funds and securities of the corporation[,]" and "shall perform other duties commonly incident to his office and shall also perform such other duties and have such other powers as the Board or the President[ or the CEO] shall designate from time to time."  (PxYY (2020 By-Laws) at AR-000311 § 29(f); PxI (2021 By-Laws) at AR-015073 § 5.2(g)).[17]  Both the 2020 By-Laws and the 2021 By-Laws also provided that the Board of Directors "may, in its discretion, determine the method and designate the signatory officer or officers, or other person or person, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name without limitation, or to enter into contracts on behalf of the corporation[,]" and

---

[15] Mr. Raviv did not, however, repay the Loan using the Bonus, which Mirror has initiated a separate litigation to recover.  (ECF No. 52 at 130, 133).

[16] (($395,000/12)*2) - $15,000 = $50,833.33.

[17] Mirror both mis-cites and mis-quotes these provisions.  (ECF No. 55 at 12 ¶ 24 (quoting "§ 5.1(g)" as stating "The Chief Executive Officer . . . ," instead of the Chief Financial Officer) (emphasis added)).

that "[a]ll checks and drafts drawn on banks or other depositories on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do." (PxYY at AR-000311–12 § 33; PxI at AR-015074 § 6.1). Mr. Raviv did not interpret these provisions to require that he obtain authorization from the Three Member Board before opening the Chase Account, nor did Dr. Har-Noy identify any provision in either the 2020 or the 2021 By-Laws that required such authorization. (ECF Nos. 52 at 106; 56 at 202–03).

**F.   Preparation for an IPO**

In preparation for an IPO, Mirror engaged Marcum as its outside auditor and Aegis as its investment banker. (ECF No. 52 at 29). "A few weeks before" December 9, 2021, however, Aegis concluded that, for "compliance" reasons, it could not "move forward with" an IPO. (PxQ at Cesano 000060; ECF No. 52 at 162–64). Mr. Raviv continued to "try[] to lobby with" Aegis to remain engaged. (ECF No. 52 at 165). On December 23, 2021, however, Aegis sent Mr. Raviv a termination letter, which he forwarded to Dr. Har-Noy as well as Mr. Kanter, Ms. Lemerond, Ms. Swersky, Dr. Cesano, Mr. Tan, Mr. Wallach, and CMF attorney Will Hart ("Mr. Hart") on December 27, 2021. (PxQ at Cesano 000057 (the "Dec. 27 Email")). In the Dec. 27 Email, Mr. Raviv stated that Aegis was:

> unable to overcome whatever issues they had with our risk disclosures regarding [Dr. Har-Noy's] background (under the guise of "their compliance dept [sic] would not let them proceed"), and they lost enthusiasm over the past several months and we lost confidence in them. Since they were unable to attract even one bridge investor and we had only 2 or 3 calls arranged through their network, it is really for the better at this point. With our new Chief Medical Officer, the upcoming appointment of our new board members, entering into engagements with our new corporate advisory board members and the renewal of our Scientific Advisory Board agreements, and of course with more than $11.5 million in the bank, we will start of 2022 with significant momentum. . . . I will update you in the next day or two with respect to board resolutions that need to be approved to

accomplish many substantive as well as administrative matters such as formal board appointments, approvals of employment agreements, issuance of equity (restricted shares and ISO's), etc. . . .

(PxQ at Cesano 000057).   In addition, Mirror had difficulty finalizing its audited financial statements, and thus was unable to finalize an S-1 registration statement, following "a whole to do between [Marcum] and [Mirror], and Dr. Har-Noy and [the] CFO, which ultimately led to [the] CFO at the time resigning."  (ECF No. 52 at 29; see ECF No. 56 at 145–48).

### G. Mr. Raviv's Employment Agreement

Mr. Raviv believed that potential investors would want to see that Mirror had a "permanent" CEO rather than an interim consultant.  (ECF No. 52 at 61).  Mr. Kanter, who has over four decades of investment experience and has served on more than 50 public company boards and 200 private company boards, agreed that "it would be very beneficial for [Mirror] to have an employee CEO" with a demonstrated "commitment" to the Company.  (ECF No. 56 at 4, 8).  Mr. Raviv hired an attorney "outside of Mirror" to draft and negotiate an employment agreement with Mirror and its counsel.  (ECF No. 52 at 61; Dx72 at 0031036).  On November 30, 2021, Mr. Raviv informed the other two members of the Three Member Board—Mr. Tan and Mr. Wallach—Dr. Har-Noy, and Mirror's outside counsel of his desire to "finalize [an] employment agreement[]" and asked Mirror's outside counsel for "advice on the right counsel for Mirror to hire" for that purpose.  (Dx22).  Neither Dr. Har-Noy nor the other members of the Three Member Board objected to Mr. Raviv's request to negotiate an employment agreement.  (ECF No. 56 at 177–78).[18]  There is no evidence that the appointment of the new directors to the Seven Member

---

[18] In this regard, the Court finds evasive and not credible Dr. Har-Noy's testimony that he found Mr. Raviv's request for an employment agreement "confusing."  (ECF No. 56 at 177–78).  The record contains no

Board was conditioned on their willingness to approve an employment agreement for Mr. Raviv. (ECF Nos. 52 at 71; 56 at 5–6, 199–200).

**1.  Drafting and negotiation of the Employment Agreement**

On December 21, 2021—before the Seven Member Board had been approved—Mr. Raviv sent to Mr. Kanter, Ms. Lemerond, Ms. Swersky, Dr. Cesano, and Mr. Hart (but not to Mr. Tan or Mr. Wallach, the other members of the Three Member Board) a draft employment agreement, which Mr. Raviv's attorney had drafted on December 9, 2021, indicating that he wanted "it to be signed by end of year."  (Dx49 at 0030589 (the "Draft Employment Agreement"); ECF No. 52 at 61-62, 182).   The Draft Employment Agreement contemplated that Mr. Raviv would be compensated as follows:  (i) annual base salary of $375,000, which could be increased on the achievement of certain milestones; (ii) an annual bonus to be determined by Mirror's board based on the achievement of "performance criteria"; (iii) an equity grant of 1,500 shares of Mirror common stock; (iv) a "signing loan" of $100,000; and (v) reimbursement of "appropriate and reasonable business expenses," including $7,500 payable on execution to reimburse Mr. Raviv's legal fees incurred in the negotiation of an employment agreement.  (Dx49 at 0030593–95).

In response, Mr. Kanter asked whether and when he had been or would be approved to join the board, whether there was an existing board, and if so, whether there was "any reason they [could not] approve it[,] i.e., the Draft Employment Agreement.  (Dx50 at AR-003453). Mr. Raviv informed Mr. Kanter, inter alia, that he (Mr. Raviv), Mr. Tan, and Mr. Wallach were

---

evidence that Dr. Har-Noy objected to Mr. Raviv's requests in November and December 2021 to negotiate such an agreement.

then the Three Member Board, that the new directors would be appointed "by a scheduled board meeting" of the Three Member Board or by unanimous written consent.   (Dx51 at 0030885). As noted above, the Seven Member Board was approved on December 29, 2021.   (PxR; see ECF No. 52 at 53).

Over the next several weeks, Mr. Raviv discussed and exchanged versions of the Draft Employment Agreement with other members of the Seven Member Board—including Mr. Tan and Mr. Wallach—and Mirror's outside counsel, Mr. Hart.   (ECF Nos. 52 at 61–62; 56 at 11–15, 18–20; PxY).   On January 13, 2022, Mr. Kanter circulated to the Seven Member Board, Dr. Margolin, and Mr. Hart the Draft Employment Agreement, as revised by Mr. Hart on January 10, 2022 (the "Revised Draft Employment Agreement").   (PxY (the "Jan. 13 Email"); ECF No. 56 at 11–12).   Mr. Kanter relayed that Mr. Raviv had circulated to himself, Ms. Lemerond, and Dr. Cesano the Draft Employment Agreement, as to which they "suggest[ed] changes" to provisions that they found "outside of 'market'" or "unusual with respect to how Compensation Plans are usually put together these days[.]"   (PxY at AR-009740).   Mr. Kanter explained that Mr. Raviv "was very respectful of [their] views, and very accommodating with respect to finding solutions to the issues raised[,]" which were implemented in "a few fast rounds of back and forth" and then "vetted" by Hart.   (Id.)   Mr. Kanter advised that he and Ms. Lemerond "were of the view that" the Revised Draft Employment Agreement "provide[d] significant incentives to [Mr. Raviv] to perform at the highest levels he can, while also protecting [Mirror] in significantly meaningful ways," and, accordingly, "strongly recommend[ed] its approval."   (Id.)   Neither Mr. Tan nor Mr. Wallach communicated to Mr. Kanter any objections to the Revised Draft Employment Agreement.   (ECF No. 56 at 15, 17).

2.  **The Jan. 19 Board Meeting**

On January 19, 2022, the Seven Member Board met via videoconference (the "Jan. 19 Board Meeting").  (ECF No. 56 at 21; PxAA).[19]  In anticipation of the Jan. 19 Board Meeting, Mr. Kanter—Chair of the Seven Member Board—had circulated an agenda that included "Approval of Adi Raviv Employment Agreement."  (PxZ; ECF No. 56 at 21).  The minutes of the Jan. 19 Meeting (the "Jan. 19 Minutes") record that, outside Mr. Raviv's presence, the following occurred:

> [Mr. Kanter] noted that there were a lot of discussions and iterations of the draft of Mr. Raviv's employment agreement though previously approved [sic].  Initial contract which was approved by UWC [Unanimous Written Consent] in late December 2021 probably represented his best shot at trying to put together something corresponding to market standards, though there were some items not at market that he was looking to have the company compensate him [for] (relatively small expenses).  [Mr. Kanter] and [Ms. Lemerond] were concerned that these may create issues if and when the contract becomes a public document (through a public filing) which would encourage others to ask for the same sort of stuff.  [Mr. Kanter] said, that after a lot of iterations, they revised the original contract including increasing the base salary in lieu of other expense compensations, increased potential bonus and more restrictions on the equity side.  The revised contract was presented to the Board for consideration.  He also noted that he knew Mr. Raviv for a long time so it was not new to him as he was working with him 20 years ago.  He noted that Mr. Raviv works around the clock, has a good grasp over the details and [is] usually focused on where a company needs to get and how to get there.  [Mr. Kanter] noted that he did not believe the Company would be well served by not having Mr. Raviv as the CEO, and that the agreement was in the shape that the Company wanted, so he proposed [to] the Board to approve the employment contract.

> Ms. Lemerond noted that the employment agreement was reviewed by [Mirror's] counsel, Will Hart, to make sure that it was in the Company's interests and Mr. Raviv had his personal lawyer [] review the agreement.

> After the discussion, Ms. Lemerond moved to approve the employment agreement of Mr. Raviv with the Company.

---

[19]  Also present were Mr. Hart and another attorney from CMF, and Seth Van Voorhees ("Mr. Van Voorhees"), who was expected to become Mirror's CFO.  (PxAA at 1).

[Mr. Kanter] seconded the motion.

The motion passed by unanimous vote.

(PxAA at 2).[20]   Mr. Kanter and Dr. Cesano confirmed the accuracy of the Jan. 19 Minutes'

description of the discussion during the Jan. 19 Meeting and unanimous vote by the Seven

Member Board—including Mr. Tan and Mr. Wallach.  (ECF No. 56 at 23; PxLLL at 40–41).  The Jan.

19 Minutes reflect that Mr. Hart, who drafted the Jan. 19 Minutes, had reviewed the Revised

Draft Employment Agreement "to make sure that it was in [Mirror's] interests."  (PxAA at 2; PxJJ

at AR-0011423, 27).[21]

At the end of the Jan. 19 Meeting, the Seven Member Board voted unanimously to

approve equity and option grants to the directors, the scientific advisory board, and other

consultants providing services to Mirror.  (PxAA at 3; ECF No. 52 at 134–35 (the "Jan. 19 Equity

Grants")).[22]

---

[20] Mr. Kanter reviewed and approved the Jan. 19 Minutes on February 13, 2022, which was a not "uncommon" delay when outside counsel is preparing a company's minutes.  (PxAA at 6; ECF No. 56 at 2).
[21] The Court deems Dr. Har-Noy's testimony that Mr. Hart told him after the Jan. 19 Board Meeting that "[h]e never reviewed the [Draft Employment Agreement] to view if it was in the interests of" Mirror (ECF No. 56 at 156), to be inadmissible hearsay.  See Fed. R. Evid. 801(c).  In addition, not only did Mr. Hart reaffirm the accuracy of the Jan. 19 Minutes—which he prepared (PxJJ)—Mirror did not call Mr. Hart as a trial witness, offer his deposition testimony, or otherwise substantiate Dr. Har-Noy's assertion that Mr. Hart denied reviewing the Draft Employment Agreement on Mirror's behalf.  Finally, Mirror does not dispute, nor could it, that Mr. Hart, as its outside counsel, could only have been reviewing the Draft Employment Agreement on Mirror's behalf.  See Prate v. Freedman, 583 F.2d 42, 48 (2d Cir. 1978) ("In our legal system, an attorney is his client's agent and representative[.]").  Accordingly, the Court finds Dr. Har-Noy's self-serving testimony not credible and instead deems the Jan. 19 Minutes to be an accurate reflection of the Jan. 19 Meeting.
[22] The Jan. 19 Minutes reference, but do not attach, a spreadsheet detailing the grants.  (PxAA at 3; ECF No. 52 at 135).

### 3. Key provisions of the Employment Agreement

On the evening of January 19, 2022, both Mr. Raviv and Mr. Kanter executed the employment agreement.  (PxBB (the "Employment Agreement")).[23]  The material terms of the Employment Agreement included:

- Designation of Mr. Raviv as President and CEO, reporting directly to the Seven Member Board, of which he was a member.  (PxBB § 4.1).

- Termination of the Raviv Consulting Agreement as of December 31, 2021, except that Mirror remained obligated to pay to Mr. Raviv and HTI "all accrued compensation and benefits and accrued but unpaid reimbursable expenses[.]" (PxBB § 1.1).

- Vesting of any unvested Stock Options as of December 31, 2021.  (PxBB § 1.3).

- A three-year term that would automatically renew for successive two-year terms absent written notice by Mirror no less than one year before the end of the initial term.  (PxBB § 3).

- Compensation to include, inter alia: (i) annual base salary of $395,000 ("Base Salary"); (ii) eligibility for an annual bonus determined by the Seven Member Board based on the achievement of certain performance criteria, initially targeted at 60% of his Base Salary (or $237,000) ("Bonus"); (iii) a grant of 2,000 shares of Mirror's capital stock to vest on a staggered schedule (the "Grant Shares"), any of which "not vested upon termination shall be immediately canceled and forfeited."  (PxBB § 5).

- Termination by Mirror for cause "immediately . . . with the approval of the majority of the Board, upon written notice to [Mr. Raviv], subject to [his] right to cure within" 60 days, with "cause" defined to exist if Mr. Raviv (i) "substantively breaches any of the materials terms or conditions of" the Employment Agreement; (ii) "fails to perform [his] duties"; (iii) "engages in willful misconduct or acts in bad faith with regard to the Company;" (iv) "is convicted of a felony or of a crime of moral turpitude or of any crime involving dishonesty or fraud with respect to" Mirror or its affiliates; or (v) "fails to comply with any reasonable instructions of the Board."  (PxBB § 6.3 (the "For Cause Provision")).   (The notice-and-cure obligation did not apply to termination under §§ 6.3(iii) or (iv)).  If terminated under the For Cause

---

[23] As noted above (see n. 9, supra), the record does not contain any employment agreement, draft or final, dated December 28, 2021.  (See ECF No. 52 at 102).

Provision, Mr. Raviv would be entitled to receive: (i) his accrued but unpaid Base Salary and benefits through the date of termination; (ii) reimbursable expenses; and (iii) accrued but unused vacation.  (PxBB § 7.1).

- Termination by Mirror without cause "at any time without prior notice, with the approval of the majority . . . of the Board"—excluding Mr. Raviv—"upon written notice by the Board to" Mr. Raviv.  (PxBB § 6.4 (the "Without Cause Provision")).  On termination under the Without Cause Provision, Mr. Raviv would be entitled to receive: (i) accrued benefits; (ii) pro rata bonus up to the date of termination; (iii) unreimbursed expenses; (iv) accrued vacation; (v) continued payments of his Base Salary for twelve (12) months after the date of termination; (vi) immediate vesting of all Mirror shares he had been awarded; and (vii) health benefits.  (PxBB § 7.2).

- A confidentiality provision.  (PxBB § 8.1).

- A New York choice of law clause.  (PxBB § 9.9).

- Agreement by Mr. Raviv and Mirror that, in the event of any litigation arising out of the Employment Agreement, "each party shall be responsible for its own attorneys' fee[s], costs and expenses."  (PxBB § 9.10).

(PxBB at 1–14).

Neither Mirror's 2021 Amended COI nor the 2021 By-Laws required shareholder approval of the Employment Agreement.  (ECF Nos. 52 at 26; 56 at 172; PxI at AR-015062–81; PxK).

### H.  Termination of Mr. Raviv's Employment

By January 31, 2022, the relationship between Dr. Har-Noy and Mr. Raviv had unraveled. In an email chain that morning, they traded barbs about whether Mr. Loo should have been appointed to the Seven Member Board to recognize his investment in Mirror, Mr. Tan's failure to observe corporate governance requirements, the press release announcing the Seven Member Board, and the lack of progress toward an IPO.  (PxEE).  Dr. Har-Noy also criticized Mr. Raviv's "unchecked spending," and professed to being "shocked" at the terms of the Employment Agreement.  (Id. at AR-010541–44).

Later that day, Dr. Har-Noy and Mr. Raviv met in-person at Mirror's office in Tampa, Florida (the "Jan. 31 Meeting"), and had a "heated discussion concerning differences of opinion" on several strategic issues, including retention of a regulatory consultant to assist Mirror in seeking drug approvals from the Food and Drug Administration ("FDA"), the manner in which Mirror conducted its clinical trials, and the possible appointment of Mr. Loo as a director. (ECF No. 54 at 18 ¶ 80; see ECF Nos. 52 at 77–81; 56 at 25, 180–84). Dr. Har-Noy testified that Mr. Raviv told him that, "if it came down to" only one of them remaining at Mirror, Dr. Har-Noy should resign and Mr. Raviv should be the one to stay. (ECF No. 56 at 180). Dr. Har-Noy found that suggestion "appalling," and believed that Mr. Raviv "needed to resign" because they could not "continue to work together." (Id.).

The next day, February 1, 2022, Dr. Har-Noy sent an email to Mr. Raviv, Mr. Kanter (as Chair of the Seven Member Board), Mr. Hart, Mr. Van Voorhees (CFO), and David Fineberg (Mirror's Chief Medical Officer ("CMO")),[24] stating, "Please be on notice that Adi has lost the confidence of the Founder and shareholders. He needs to resign or will be removed." (Dx57 at 0010447; ECF No. 56 at 186). On February 4, 2022, Mr. Loo sent a request to Mr. Kanter and Mr. Raviv to "fix a record date for proposed action by written consent of the shareholders" for three purposes: "(1) the removal, without cause, of some or all of the directors of the Company; (ii) [sic] amendment of Section 19(a) of the Bylaws of the Company to provide that vacancies in the Board may be filled by the stockholders; and (iii) election of new directors of the Company to fill the Board vacancies." (Dx63 at 0020003 (the "Feb. 4 Request")). As authority for the Feb. 4 Request, Mr. Loo cited "Section 38(b)" (id.), which was a reference to the 2020 By-Laws (PxYY at

---

[24] Dr. Fineberg's name appears in the trial transcript as "Feinberg." (ECF No. 56 at 182, 197).

AR-000313), rather than the 2021 By-Laws, which were then in effect and did not contain a "Section 38(b)."  (PxI).  Mr. Kanter then sent Mr. Tan the operative 2021 By-Laws.  (Dx63 at 0019998).

> On February 6, 2022, Mr. Tan sent an email to the Seven Member Board, stating:
>
> In light of recent events, the Company's majority stockholders have lost confidence in Adi and the Board to act in the best interest of the Company and to manage its business and affairs.  Accordingly, the majority shareholders will be exercising their rights under Delaware law to reconstitute the Board, and thereafter to have the new Board replace Adi as CEO. . . .
>
> Our controlling shareholders have requested that each of you voluntarily tender your resignations so that legal action is not necessary.  By resigning now this will assist the shareholders in expediting the inevitable reconstitution of the Board and removal of Adi as CEO.  The shareholders have also asked that you please preserve all relevant documents, records, and communications relating in any way to Mirror Biologics.

(PxII (the "Feb. 6 Email")).  Mr. Tan also copied on the Feb. 6 Email two attorneys at Potter Anderson & Corroon LLP ("PAC"), Delaware litigation counsel retained by "the majority stockholders."  (Id.).  Dr. Har-Noy was not copied on the Feb. 6 Email, but the Court infers that he is included in "the majority stockholders" to whom Mr. Tan referred.  In response to the Feb. 6 Email, the directors on the Seven Member Board—other than Mr. Tan, Mr. Kanter, and Mr. Raviv—resigned.  (ECF No. 52 at 89).  Mr. Kanter declined to resign in response to the Feb. 6 Email because the shareholders had not yet acted and he believed "it was our responsibility, until the shareholders actually act, to continue to perform the duties and services that we signed up for and agreed to perform."  (ECF No. 56 at 33; see Dx62 at 1–2).  In response to the Feb. 6 Email, Mr. Raviv stated:

> I am in possession of your letter and will be assembling this information over the course of the next few days as it becomes available.  As you know, there are only 2 official c-level executives in the company-myself and David Fineberg, our CMO.

Our CFO has signed his agreement but I will wait for the board to advise whether or not it should be countersigned by me.  We have an outside financial/accounting firm that works on our books and records, but they are contracted out, not internal employees.  Therefore, I require their support and assistance.

(Dx62 at 1).  Also on February 6, 2022, Mr. Tan sent a letter to the Seven Member Board and Mirror's "Acting Officer Having Custody of Books and Records," demanding production by February 8, 2022, of documents concerning, inter alia, the BoA Account, employment agreements, minutes, and stock ledgers.  (Dx61).  Mr. Raviv provided to CMF documents to produce to Mr. Tan, albeit not by the deadline Mr. Tan had demanded.  (ECF No. 52 at 240).  On February 6 and 7, 2022, Mr. Raviv and Mr. Kanter corresponded with Dr. Cesano, Ms. Lemerond, Dr. Margolin, and CMF about steps they could take to protect the interests of "employees, contractors, consultants," and other "constituencies that might be ignored . . . , the Board included."  (Dx63 at 0019998; see ECF No. 56 at 84).

Not satisfied with the pace of Mr. Raviv's exit, on February 11, 2022, Dr. Har-Noy sent to the Seven Member Board a "Message from the Founder," stating that Mr. Raviv "has lost the support of our shareholders" and that "recent conversations . . . confirmed to me that he and I have irreconcilable differences with how the Company should be run and the type of Company culture we are creating."  (PxPP at AR-011622 (the "Feb. 11 Email")).  Dr. Har-Noy also suggested that "certain actions have been taken that could harm the Company, including bills not being paid, essential equipment not being purchased, key employees not being hired and our bioreactor and research programs being stalled."  (Id.)  Mr. Kanter responded to Dr. Har-Noy that "things are not as rosy as you have represented to the investors" concerning Mirror's clinical trials, that although he (Mr. Kanter), Mr. Raviv, and Mr. Tan were the only remaining directors from the Seven Member Board, he expected to resign as well, and that Dr. Har-Noy, "[h]aving

initiated the 'takeover,' . . . must now finish it" in a manner consistent with the 2021 By-Laws. (PxQQ; <u>see</u> ECF No. 56 at 37–39 ("[T]here were questions that were being raised about the quality of the work that was being done")).

In response to the Feb. 4 Request, on or about February 12, 2022, Kanter sent a "Notice of a Board Meeting" to be held on February 14, 2022 for purposes of setting a record date (the "Feb. 14 Meeting").[25] (PxSS at AR-011700–01). Mr. Tan objected to the Feb. 14 Meeting, telling Mr. Raviv and Mr. Kanter that "there is no rational business purpose for setting the record date any later than February 15, prolonging the current situation, attempting to frustrate the stockholders' rights under Delaware law to remove and reconstitute the Board and to remove Adi as CEO, or delaying this inevitable outcome any longer." (<u>Id.</u> at AR-011701). Mr. Kanter responded, <u>inter alia</u>, that he did "not expect to be on the Board much past setting the record date, but that still leaves you all needing to deal with Adi during the interim period, and the sooner that is done with some recognition that the Company has obligations to him too, the more likely it is that you all might make some progress in getting to a workable understanding. Regardless, best of luck to all of you." (<u>Id.</u> at AR-011700). Mr. Raviv also responded, countering Dr. Har-Noy's and Mr. Tan's accusations of wrongdoing by noting that he "made all payments my accounting team and I were aware of and negotiated successfully with vendors," and that Dr. Har-Noy had "frustrated" his attempts to "do a serious and deep dive into the state of the clinical trials and clinical data." (<u>Id.</u> at AR-011699). Mr. Raviv also reported that Dr. Har-Noy had notified

---

[25] Section 3.7 of the 2021 By-Laws provides that "For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date, shall be entitled to vote at any meeting of stockholders." (PxI at AR-015065).

Chase that he planned to "take over" the Chase Account, despite then being neither an officer or director of Mirror or having any "authority to speak on behalf of the company."  (Id.)

At some point in February, Mr. Raviv initiated the issuance of Mirror stock certificates reflecting the Jan. 19 Equity Grants, which the Seven Member Board had approved at the Jan. 19 Meeting.  (ECF No. 52 at 135).  Mr. Raviv provided the list of the Jan. 19 Equity Grants to Mr. Van Voorhees, the CFO, who issued and sent the stock certificates to the recipients.  (Id.; see PxI at AR-015074 §§ 6.1, 7.1).  Mr. Raviv knew that he would be leaving Mirror, but caused the Jan. 19 Equity Grants to issue because he "wanted to make sure that the people that had received them through the [Jan. 19 M]eeting and had those grants approved would receive them" and "was concerned that they would not receive them once we were gone."  (ECF No. 52 at 136).  On February 15, 2022, Mr. Raviv authorized a payment of $133,940.00 from the Chase Account to CMF for legal fees invoiced pursuant to the CMF Engagement Letter.  (Dx24 at 19; PxF at AR-015312; PxNN at AR-015339; ECF No. 52 at 136–37).

The record does not reflect whether the Feb. 14 Meeting occurred.  In addition, at some point between February 13, 2022 and February 24, 2022, a new board of directors was constituted—as to when and how Mirror provided no evidence—consisting of Mr. Tan, Dr. Har-Noy, Mr. Loo, Michael Chieng ("Mr. Chieng"),[26] and Datin Jane Yeo (the "Five Member Board").  (PxWW; see ECF No. 52 at 100–01).  On February 24, 2022, the Five Member Board executed a unanimous written consent declaring that, pursuant to Section 5.4 of the 2021 By-Laws, "effective immediately," Mr. Raviv was removed as President and CEO and replaced by Dr. Har-

---

[26] Like Mr. Tan, Mr. Chieng also held an interest in the company that served as Mirror's Southeast Asia distributor.  (ECF Nos. 52 at 38, 92; 56 at 83).

Noy.  (PxWW at AR-000108 (the "Feb. 24 UWC")).  The Feb. 24 UWC does not mention any "cause" for Mr. Raviv's termination.  (PxWW).  The same day, PAC sent Mr. Raviv a letter attaching a copy of the Feb. 24 UWC and informing him that his "employment as President and Chief Executive Officer of the Company has been terminated, effective immediately."  (PxWW at AR-000107 (the "First Feb. 24 Letter")).  A second version of the Feb. 24 Letter stated that Mr. Raviv was being notified "pursuant to Sections 6.4 and 9.1 of the Employment Agreement entered into by and between the Company, you, and HTI Associates LLC, dated December 28, 2021."  (PxXX (the "Second Feb. 24 Letter," with the First Feb. 24 Letter, the "Feb. 24 Letters")).  As noted above, the record does not contain any employment agreement with Mr. Raviv dated December 28, 2021.  (See nn. 9, 23, supra).  Neither the First nor the Second Feb. 24 Letters mentioned any "cause" for Mr. Raviv's termination.  (PxWW; PxXX; see ECF No. 52 at 101–02).  Accordingly, when the Five Member Board terminated Mr. Raviv's "employment" via the Feb. 25 UWC, that termination could only have been pursuant to and governed by the Employment Agreement.  (ECF No. 52 at 102).

On March 2, 2022, Mr. Raviv's counsel wrote to PAC in response to the Feb. 24 Letters, noting that Mr. Raviv was employed as President and CEO of Mirror pursuant to the Employment Agreement, which was dated as of January 19, 2022 and contained the For Cause Provision.  (Dx69).  Mr. Raviv's counsel also noted that neither the Feb. 24 UWC nor the Feb. 24 Letters referenced cause for Mr. Raviv's termination, which, "by default, . . . must be deemed without Cause pursuant to Section 6.4 of the Employment Agreement."  (Dx69).  As a result, Mr. Raviv's counsel stated that Mr. Raviv was entitled "to: (i) continued payment of his Base Salary ($395,000 on an annual basis) for 12 months; and (ii) immediate vesting of all unvested Grant Shares[,]" and

expected to execute "a valid general release of all claims against the Company and its

Affiliates . . . ." (Dx69; see PxI § 7.2).  Mr. Raviv's counsel requested that PAC provide a draft of

the release by March 9, 2022, in the absence of which Mr. Raviv would "assume that the

Company does not intend to honor its contractual obligations in this regard, in which case Mr.

Raviv will have no choice by to pursue his legal rights in court in New York, pursuant to Section 9.9

of the Employment Agreement." (Dx69).  In response, PAC requested a copy of the Employment

Agreement, which Mr. Raviv's counsel provided, along with the Raviv Consulting Agreement and

the Jan. 19 Board Minutes approving the Employment Agreement.  (Dx69).  PAC responded via

email on March 9, 2022, asserting for the first time that:

> Mr. Raviv was terminated for cause, and the basis for his for-cause termination is well-
> known to him now and was well-known to him at the time of his termination and includes,
> but is not limited to, his breaches of fiduciary duties owed to Mirror [] and its
> stockholders, breach of contract, misuse of corporate funds, acting without authorization
> by the Company's Board of Directors, and other misconduct and wrongdoing.  The
> Company is currently conducting an investigation into the full scope of the damage that
> Mr. Raviv caused the Company and its stockholders and, once that investigation has
> concluded, the Company will determine whether to assert claims, and which claims to
> assert, against him.

(Dx69 (the "Mar. 9 Email")).  Mr. Raviv's counsel reasserted that because Mirror "provided him

with no prior written notice of any condition constituting cause, as the Employment Agreement

requires[,]" the only "reasonable inference" was that Mirror did not terminate him for cause.

(Dx69).

The exchange of threats and innuendo continued thereafter.  (Dx69).  Dr. Har-Noy and

Ms. Bui testified that Mirror performed an "audit" or "investigation" and filed an insurance claim

to recover $489,015 that it claimed Mr. Raviv misappropriated from the Company.  (ECF Nos. 56

at 213–14; 58 at 47–48).  Mirror did not introduce any documentation regarding the conduct or

results of any "audit" or "investigation," a copy of the insurance claim or any response thereto, or any breakdown of the $489,015 that it claimed Mr. Raviv misappropriated.

Since his termination, Mirror has not: (i) delivered to Mr. Raviv the Stock Options (PxBB § 1.3); (ii) paid him any Base Salary (PxBB §§ 5.1, 7.2(e)); (iii) paid him any pro-rated bonus (PxBB §§ 5.2, 7.2(b)); nor (iv) delivered to him the Grant Shares (PxBB §§ 5.4, 7.2(f)), all of which Mr. Raviv seeks to recover.  (ECF Nos. 52 at 20, 76–77, 146; 54 at 20, 34–35).

Dr. Har-Noy remained President and CEO of Mirror until late 2022, when Scott Filosi ("Mr. Filosi") became CEO.  (ECF No. 56 at 217).  On July 7, 2023, Dr. Har-Noy terminated Mr. Filosi, along with Mirror's CFO and CMO.  (Id. at 217–18).

**I.   This Action**

On August 11, 2022, Mr. Raviv filed the Complaint, asserting a single breach of contract claim against Mirror, alleging that Mirror breached the Employment Agreement by:  (i) failing to memorialize the grant of the Stock Options; (ii) terminating Mr. Raviv without cause; and (iii) failing to provide Mr. Raviv with the payments and benefits required under Section 7.2 of the Employment Agreement.  (ECF No. 1 ¶¶ 47–52 (the "Complaint")).  As remedies, Mr. Raviv sought an order: (i) "compelling Mirror to memorialize the fully vested Stock Options in accordance with the [Raviv] Consulting Agreement and the Employment Agreement;" and (ii) awarding "no less than $5,000,000" in damages.  (Id. at 10).

On October 4, 2022, Mirror filed an Answer in which it asserted affirmative defenses that, inter alia, Mr. Raviv breached the Employment Agreement, procured the Employment Agreement by fraud, breached his fiduciary duties to Mirror, and acted with unclean hands.  (ECF

No. 12 ¶¶ 1–70 (the "Answer")).  Mirror did not, however, assert any counterclaims in the

Answer or at any other time in this action.  (Id.)

During discovery, Mr. Raviv served on Mirror requests for admission, four of which are

relevant here:

6. On December 29, 2021, the Board voted to expand its size and appointed Joel Kanter as a member and Chairperson of the Board, and the Board further appointed Nicole Lemerond and Dr. Alessandra Cesano as members of the Board.

. . .

10.  During the January 19, 2022 Meeting, the Board unanimously voted to approve an employment agreement between [Mr. Raviv] and Mirror (the "Employment Agreement").

. . .

12.  The January 19, 2022 Board Minutes accurately reflect what transpired during the January 19, 2022 Meeting.

. . .

16.  The Employment Agreement is a valid and enforceable agreement between [Mr. Raviv] and Mirror.

(PxC at 3–5 (the "RFAs")).  Mirror denied these RFAs.  (Id.)

The parties consented to Magistrate Judge jurisdiction for all purposes, (ECF No. 10), and

later stipulated to proceed to a bench trial.  (ECF No. 35).  Over the course of three days,

October 16–18, 2023, the Court presided over the bench trial, during which Mr. Raviv, Mr.

Kanter, Dr. Har-Noy, and Ms. Bui testified, and dozens of exhibits were admitted.[27]  (ECF min.

---

[27] The following exhibits were admitted at trial: PxAA; PxB; PxBB; PxBBB; PxX; PxCCC; PxD; PxDD; PxDDD; PxE; PxEE; PxEEE; PxF; PxGGG; PxH; PxHH; PxHHH; PxI; PxII; PxIII; PxJ; PxJJ; PxJJJ; PxK; PxKKK; PxLLL; PxM; PxMMM; PxN; PxNN; PxOO; PxP; PxPP; PxQ; PxQQ; PxR; PxS; PxSS; PxTT; PxWW; PxXX; PxY; PxYY; PxZ; PxZZ; Dx5; Dx7; Dx11; Dx12; Dx19; Dx20; Dx22; Dx24; Dx25; Dx31; Dx32; Dx37; Dx49; Dx50; Dx51; Dx55; Dx57; Dx59; Dx61; Dx62; Dx63; Dx69; Dx70; Dx71; Dx72; Dx73; Dx74; and Dx75.

entries Oct. 16–18, 2023; ECF Nos. 52; 56; 58).   Pursuant to a Court-ordered schedule, on November 15, 2023, Mr. Raviv filed his post-trial proposed findings of fact and conclusions of law, and on December 11, 2023, Mirror filed its proposed post-trial findings of fact and conclusions of law.  (ECF Nos. 54; 55).

### III. DISCUSSION

#### A. Legal Standard

##### 1. Burden of Proof

"In [a] breach of contract action, [the plaintiff bears] the burden of proving the material allegations in the complaint by a fair preponderance of the evidence."  V.S. Int'l, S.A. v. Boyden World Corp., 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994).[28]  "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true."  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); see Abrams v. United States, No. 66 Civ. 1585, 1970 WL 432, at *1 (S.D.N.Y. Nov. 19, 1970) ("To establish by a preponderance of the evidence means to prove that something is more likely so than not so.  In other words, preponderance of the evidence means such evidence as, when considered and compared with what is opposed to it, has more convincing proof and produces in your mind belief that what is sought to be proved is more likely true than not true."); accord Chen v. H.B. Rest. Grp., Inc., No. 16 Civ. 2005 (RWL), 2020 WL 115279, at *8 (S.D.N.Y. Jan. 9, 2020).  The defendant bears the burden to prove any affirmative defenses by a similar preponderance of the evidence.  See N.Y. State Elec. & Gas Corp. v. First Energy Corp., 766 F.3d 212, 240 (2d Cir. 2014); Howard Univ. v. Borders, No. 20 Civ. 4716 (LJL), 2022 WL 3568477, at *7 (S.D.N.Y. Aug. 17, 2022); Trs. of Welfare Fund & Pension Fund of Local

---

[28] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

No. One, I.A.T.S.E. v. A. Terzi Prod., Inc., No. 97 Civ. 8262 (MGC), 1999 WL 33870, at *1 (S.D.N.Y. Jan. 25, 1999).

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited.  And as the trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  Java v. El Aguila Bar Rest. Corp., No. 16 Civ. 6691 (JLC), 2018 WL 1953186, at *2 (S.D.N.Y. Apr. 25, 2018); see Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).

### 2.  Breach of Contract

#### a.  Elements

To establish a breach of contract claim under New York law,[29] a plaintiff must prove four elements: "(1) the existence of a contract; (2) the performance of that contract by one party; (3) the breach of that contract by the other party; and (4) damages."  LG Cap. Funding, LLC v. Energy Edge Techs. Corp., No. 17 Civ. 9021 (AKH), 2018 WL 4278344, at *1 (S.D.N.Y. Aug. 28, 2018); accord Lenard v. Design Studio, 889 F. Supp. 2d 518, 528 (S.D.N.Y. 2012).

---

[29] Although Mirror is a Delaware corporation with a principal place of business in Florida (ECF Nos. 1 ¶ 10; 12 ¶ 10; 55 ¶ 2), and the Raviv Consulting Agreement contains a Delaware choice of law clause (PxD at 7), the Employment Agreement contains a New York choice of law clause (PxBB § 9.9).  Mirror's post-trial submission does not contain a choice of law analysis and relies primarily on New York law for the contractual issues in dispute.  (ECF No. 55 at 30, 36–38, 41).  Accordingly, the Court deems Mirror to have consented to the application of New York law to the Court's determination of the elements of Mr. Raviv's breach of contract claim.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (holding that where "the parties' briefs assume that New York law controls . . . such implied consent . . . is sufficient to establish choice of law"); Americas Ins. Co. v. Stolt-Nielsen, Inc., No. 97 Civ. 8018 (RCC), 2004 WL 2199497, at *3 (S.D.N.Y. Sept. 30, 2004) (applying New York law where "the parties in this case have proceeded on the assumption that New York's substantive law governs, and by their conduct have impliedly consented to the application of New York law to the merits of this case").  The parties invoke, and the Court therefore applies, Delaware law concerning the composition and authority of Mirror's board of directors.  (ECF Nos. 54 at 30; 55 at 40–41; see § III.B.1, infra).

### b.  Interpreting Contractual Provisions

"In construing a New York contract, '[i]f a contract is unambiguous on its face, its proper construction is a question of law.'"  Talon Pro. Servs., LLC v. CenterLight Health Sys. Inc., No. 20 Civ. 78 (PAE), 2021 WL 1199430, at *4 (S.D.N.Y. Mar. 30, 2021) (quoting Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990)).  "[T]he Court must determine whether ambiguity exists by reading the terms in question in light of their plain meaning and the overall context of the agreement."  Schwartz v. Natwest Markets, PLC, No. 99 Civ. 11010 (AGS), 2001 WL 1006727, at *6 (S.D.N.Y. Aug. 31, 2001) (citing Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1095 (2d Cir. 1993)).  A contract is ambiguous if a "reasonably intelligent person viewing the contract objectively could interpret the language in more than one way."  Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  A contract is unambiguous if its terms have "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).

### c.  Employment Contracts

Under New York law, "[a]n employer has the right to terminate employment at any time and for any reason or no reason at all, except as that right may have been limited by express agreement with the employee."  Pisani v. Westchester Cnty. Health Care Corp., 424 F. Supp. 2d 710, 719 (S.D.N.Y. 2006).  Thus, where an employment agreement "specifies conditions precedent to the right of cancellation, the conditions must be complied with."  Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 727 (2d Cir. 1992).  Failure to effect termination according to the terms of a contract constitutes a breach.  See Brueckner v. You Can Beam, LLC, No. 20 Civ. 3323

(JSR), 2021 WL 2158733, at *4 (S.D.N.Y. May 27, 2021) ("When a contract's terms include a procedure for termination, [] New York law demands strict compliance with that procedure."); Mark IV Indust., Inc. v. Kerns, No. 12 Civ. 43A(F) (RJA) (LGF), 2013 WL 12310665, at *10–13 (W.D.N.Y. July 18, 2013) (finding that employer's termination of employee without notice and opportunity to appear before board to challenge termination, as required by employment agreement, "render[ed] the termination without effect"); Hanson v. Cap. Dist. Sports, Inc., 218 A.D.2d 909, 910–11 (3d Dep't 1995) (finding that employer breached contract by terminating employee without prior notice and opportunity to cure, as required by employment agreement); see also Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518–19 (2d Cir. 1989) (affirming finding of breach of contract for failure to provide required notice of termination).

"Where a contract provides that employment may be terminated only 'for cause,' an employer may rebut a wrongful discharge claim by producing evidence that shows some basis for dissatisfaction with the employee's work." Hoerner v. Metro. Life Ins. Co., No. 98 Civ. 4210 (MBM), 2001 WL 277297, at *4 (S.D.N.Y. Mar. 21, 2001) (citing Golden v. Worldwide Enters., Inc., 133 A.D. 2d 50, 51 (1st Dep't 1987)). The employer "may seek to justify its termination of the employee for cause based on information obtained after the termination." Fitzpatrick v. Amer. Int'l Grp., No. 10 Civ. 142 (MHD), 2013 WL 709048, at *26 (S.D.N.Y. Feb. 26, 2013) (collecting cases). The burden then shifts to the employee "to prove that the employer's satisfaction was not genuine." Hoerner, 2001 WL 277297, at *4.

B. **Application**

As demonstrated by the Court's findings of fact set forth above, Mirror's observance of corporate governance formalities left much to be desired.  In fact, the observance of corporate formalities at Mirror before Mr. Raviv arrived was more in the breach than in the norm, with Dr. Har-Noy making all decisions as the founder and majority shareholder, and Ms. Bui, Dr. Har-Noy's wife and a non-employee, managing the finances.  Starting in 2021, Mr. Raviv, in good faith, sought to fulfill the mission for which Dr. Har-Noy hired him as President and CEO—to bring Mirror's governance, records, and operations into compliance in preparation for an IPO. Achieving that goal, however, required fundamental changes to Mirror that Dr. Har-Noy's ego and emotions apparently could not countenance.  While, as the founder of Mirror, it is certainly Dr. Har-Noy's prerogative that the Company be run in his image, for Mirror to become a public company, that prerogative needed to align with the requirements of Delaware and SEC corporate governance principles, which is what Mr. Raviv sought to achieve by bringing on experienced, independent directors, engaging competent outside advisors, and implementing necessary corporate governance reforms.  For his efforts, he appears to have been made the scapegoat for an IPO that was doomed from the start and punished by a precipitous termination, which Mirror has sought to reverse-engineer as somehow caused by alleged breaches of fiduciary duties.

As a result of a thorough review of admitted evidence and observance of the demeanor of the witnesses at trial, the Court concludes that Mr. Raviv has shown, by a preponderance of the evidence, that Mirror breached the Employment Agreement, which is a binding and enforceable contract, and that Mirror has failed to establish its affirmative defenses by the requisite preponderance of the evidence.  That conclusion does not, however, equate to an

award to Mr. Raviv of all the damages he seeks.  The Court instead grants him a more modest award as set forth below.

### 1.  The Employment Agreement is a Binding and Enforceable Contract.

Mr. Raviv contends that Mirror breached the Employment Agreement when it terminated him without cause on February 24, 2022.  (ECF Nos. 1 ¶¶ 50–52; 54 at 30–34).  Mirror contends that the Employment Agreement was never properly approved and was the result of fraud in the inducement and breaches of fiduciary duties by Mr. Raviv.  (ECF Nos. 12 ¶¶ 50–52, 64–67; 55 at 30–41).  The Court finds that the Employment Agreement was properly approved by the Seven Member Board, was binding on Mirror, and was not the product of fraud or breaches of fiduciary duties.  Mr. Raviv has thus established the first element of a breach of contract claim.

### a.  The Seven Member Board Had Authority to Enter Into the Employment Agreement.

Because Mr. Raviv alleges that Mirror breached the Employment Agreement, which the Seven Member Board approved at the Jan. 19 Meeting, the threshold questions are whether the Seven Member Board had authority to approve, and did validly approve, the Employment Agreement.  (See ECF Nos. 54 at 28–30; 55 at 30–35, 40–41).  The Court answers both questions in the affirmative.

As an initial matter, Mirror does not meaningfully dispute that the Seven Member Board was properly constituted and had authority to act on Mirror's behalf.  (See generally ECF No. 55).  In addition, Mr. Raviv has shown that, by the Dec. 29 UWC, the Three Member Board validly expanded to become the Seven Member Board.  (ECF No. 54 at 28–29).  First, Dr. Har-Noy himself

approved the 2021 Amended COI, which permitted Mirror's board of directors to "fix[]" the number of directors.  (PxHH; PxI at AR-015059–60).

Second, both the 2020 By-Laws, which permitted up to seven directors, and the 2021 By-Laws provided for vacancies as well as "newly created directorships" to be filled "by the affirmative vote of a majority of directors then in office."  (PxHH; PxI at AR-015068–69).  Despite Mr. Raviv informing Dr. Har-Noy of the efforts to recruit new directors—two of whom Dr. Har-Noy met with and one of whom Dr. Har-Noy suggested—Dr. Har-Noy voiced neither any objection to having more than three directors nor to any of the candidates.  (ECF Nos. 52 at 31–37; 56 at 139–43, 229–30; PxP; PxCCC).  Dr. Har-Noy also subsequently recognized Mr. Kanter's authority as Chair.  (Dx57 at 0010447; ECF No. 56 at 186).

Third, pursuant to the 2021 Amended COI and the 2021 By-Laws, the Three Member Board validly executed the Dec. 29 UWC increasing the number of directors to seven and appointing Mr. Kanter, Ms. Lemerond, Ms. Swersky, and Dr. Cesano as directors to form the Seven Member Board, of which Mr. Kanter was Chair.  (PxR; ECF No. 52 at 53).  Indeed, Dr. Har-Noy commended Mr. Raviv for his efforts in bringing on the new directors and securing Mr. Kanter as Chair.  (PxOO at AR-011565; ECF No. 56 at 186).

Fourth and finally, Mirror points to no provision of the 2021 Amended COI or either the 2020 or 2021 By-Laws requiring majority shareholder approval of the number or identity of directors.  (See generally ECF No. 55).

Thus, the Seven Member Board was validly constituted and, as such, was authorized to "manage[] the business and the conduct of the affairs of" Mirror (PxI AR-015059), including entering into an employment agreement with an executive, i.e., the Employment Agreement for

Mr. Raviv.  See generally Hills Stores Co. v. Bozic, 769 A.2d 88, 102 (Del. Ch. Ct. 2000) (noting that

shareholders had "no right to challenge" board of directors' approval of executives' employment

agreements).

Notwithstanding the observance of corporate governance requirements in the

constitution of the Seven Member Board and in the approval of the Employment Agreement,

Mirror now argues that the Seven Member Board lacked authority to approve the Employment

Agreement, such that it is unenforceable.  (ECF No. 55 at 40–41).  Citing Schnell v. Chris-Craft

Indus., Inc., 285 A.2d. 437, 439 (Del. 1971), Mirror argues that, even if the Employment

Agreement "was legally executed, the circumstances surrounding its approval were so

inequitable that it would [sic] not be enforced."  (ECF No. 55 at 40).  The "circumstances" to which

Mirror points are Mr. Raviv's: (i) disclosure of "proprietary information to prospective board

members and negotiat[ions] with them"; (ii) negotiating his own Employment Agreement; (iii)

"stack[ing] the board with people he knew he would control in order to obtain a highly favorable

and lucrative employment agreement; (iv) opening the Chase Account; (v) "conver[sion of] funds

from the Company's account to himself without authority or justification"; (vi) negotiation of the

Employment Agreement containing "highly advantageous provisions concerning termination for

cause and vesting to address his concerns that he would be fired due to lack of performance in

delivering an IPO"; and (vii) acting "disloyally and put[ting] the Company's interests below his

own when it became clear he was going to be fired for cause and delay[ing] the smooth transition

of the board and [sic] fail[ing] to pay suppliers."  (ECF No. 55 at 40–41).

In Schnell, the Delaware Supreme Court held that "inequitable action does not become

permissible simply because it is legally possible[,]" and reversed a board of directors' decision to

reschedule the date of an annual shareholders' meeting.  285 A.2d at 438–40.  In reinstating the annual meeting date set by the company's by-laws, the court disapproved of the "tactics" the board used to "perpetuat[e] itself in office," including "disingenuously resist[ing] the production of a list of its stockholders" to a group of dissident stockholders and "hiring [] two established proxy solicitors" in order to "obstruct[] the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management."  Id. at 439.  Delaware courts have since recognized Schnell as standing for the proposition that "Delaware corporations may not take actions toward their stockholders which, though legally possible, are inequitable."  Accipiter Life Sci. Fund, L.P. v. Helfer, 905 A.2d 115, 124 (Del. Ch. Ct. 2006).

The Court finds that the Schnell doctrine does not provide grounds to invalidate the Employment Agreement.  First, the Delaware Supreme Court has recognized that the Schnell doctrine is "reserved . . . for 'those instances that threaten the fabric of the law, or by which an improper manipulation of the law, would deprive a person of a clear right.'"  Coster v. UPI Cos., 300 A.3d 656, 666 (Del. 2023) (quoting Alabama By-Prod. Corp. v. Neal, 588 A.2d 255, 258 n.1 (Del. 1991)); see In re WeWork Litig., 250 A.3d 976, 996 (Del. Ch. 2020) ("[O]ur case law is indicative of a healthy inclination on the part of the judiciary to employ the Schnell principle of legal but inequitable only sparingly, and typically does so only when inequitable conduct has occurred but is plainly not remediable under conventional fiduciary doctrines.").  Indeed, "[a]lmost all of the post-Schnell decisions involved situations where boards of directors deliberately employed various legal strategies either to frustrate or completely disenfranchise a shareholder vote."  Stroud v. Grace, 606 A.2d 75, 91 (Del. 1992).  Here, Mirror has not shown that any of its corporate governance documents required a shareholder vote—or required

Dr. Har-Noy to vote—to approve the Employment Agreement, or that any other shareholder right was compromised by the Seven Member Board's approval of the Employment Agreement. (See ECF Nos. 52 at 26; 56 at 172; PxI at AR-015062–81; PxK).  Because Mirror has not shown that the Seven Member Board's approval of the Employment Agreement "interfere[d] with the stockholder franchise[,]" review of that approval under Schnell is not warranted.  Coster, 300 A.2d at 667; see Accipiter, 905 A.2d at 124–26 (finding Schnell inapplicable where directors "did not act with the specific intent to limit the stockholder's rights to nominate and elect a dissident slate"); Williams v. Geier, 671 A.2d 1368, 1384 (Del. 1996) (finding Schnell inapplicable where share recapitalization plan did not have entrenchment as "its sole or primary purpose").

Second, the Court finds that the Employment Agreement was not, as Mirror contends, "unconscionable" or "inequitable." (ECF Nos. 12 ¶ 67; 55 at 40).  As an initial matter, Mirror cites no Delaware authority for its contention that the Employment Agreement was inequitable due to the provision that "the options granted to [Mr. Raviv] as a consultant automatically vest, whether or not he fulfilled the conditions precedent to the vesting of such options under the [Raviv] Consulting Agreement, upon his dismissal without Cause or for Good Reason."  (ECF No. 55 at 41 (citing PxBB §§ 1.3, 7.2(f)).  Nor has the Court's independent research located any provision of Delaware law prohibiting the automatic vesting of options granted to an executive later dismissed without cause.  Furthermore, "[a] board of director[]s['] decision on how much to pay a company's chief executive officer is the quintessential business determination subject to great judicial deference."  Tornetta v. Musk, 310 A.3d 430, 445 (Del. Ch. Ct. 2024). Under the business judgment rule applicable to a board's approval of an executive compensation package, "the board's decision will be upheld unless it cannot be attributed to any rational business

purpose."  In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 74 (Del. 2006) ("Disney II").  A party

who "fails to rebut the business judgment rule presumption is not entitled to any remedy unless

the transaction constitutes waste[,]" id., which requires a showing that the transaction was "so

one sided that no business person of ordinary, sound judgment could conclude that the

corporation has received adequate consideration."  Brehm v. Eisner, 746 A.2d 244, 263 (Del.

2000).

Mirror, who bears the burden of proving its affirmative defenses, has not made that

showing here.  Although Mr. Raviv's attorney prepared the Draft Employment Agreement (Dx49),

Mr. Kanter, whom the Court found to be a credible witness with deep experience in corporate

governance and executive compensation, led the negotiations and proposed numerous revisions,

many of which were adopted, to ensure that the final Employment Agreement comported with

Delaware and federal law.  (ECF No. 56 at 11–15, 18–20; PxY).  Mr. Tan and Mr. Wallach were

included in discussions about the drafts and voiced no objections to any of the provisions, and

Mr. Hart, Mirror's outside counsel, prepared the Revised Draft Employment Agreement.

(ECF Nos. 52 at 61–62; 56 at 11–20; PxY).  The full Seven Member Board received advance notice

that Mr. Raviv's Employment Agreement was on the agenda for the Jan. 19 Meeting (PxZ), and

the Jan. 19 Minutes—which Mr. Hart prepared—reflect a substantive discussion of the topic,

outside Mr. Raviv's presence, including that Mr. Hart had reviewed the Employment Agreement

"to make sure that it was in the Company's interest."  (PxAA at 2).[30]  The Seven Member Board—

including Mr. Tan and Mr. Wallach, who again neither raised any objection nor asserted that they

---

[30] As noted above, the Court has deemed the Jan. 19 Minutes to be an accurate reflection of the events
at the Jan. 19 Meeting.  (See n.21, supra).

had not seen the document—approved the Employment Agreement.  (PxAA at 3).  Mr. Tan and

Mr. Wallach, of course, had a duty of care as directors "to inform themselves, before making a

business decision, of all material information reasonably available to them[,]" including the Draft

Employment Agreement.  TVI Corp. v. Gallagher, Civil Action No. 7798-VCP, 2013 WL 5809271, at

*14 (Del. Ch. Ct. Oct. 28, 2013); accord Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150,

192 (Del. Ch. Ct. 2005).

Accordingly, the Court finds that Mirror has failed to prove, by a preponderance of the

evidence, its affirmative defense that the Employment Agreement is unenforceable due to

inequity or unconscionability.   See Brehm, 746 A.2d at 267 (rejecting claim that even

"extraordinarily lucrative compensation agreement and termination payout awarded a company

president who served for only a little over a year and who underperformed" fell outside board of

directors' discretion under business judgment rule); Orban v. Field, Civil Action No. 12820, 1997

WL 153831, at *10–11 (Del. Ch. Ct. Apr. 1, 1997) (holding that board's approval of executive's

compensation agreement did not violate business judgment rule).

### b. **The Employment Agreement did not result from fraud in the inducement.**

Mirror also asserts as an affirmative defense that Mr. Raviv procured the Employment

Agreement by fraud, rendering it "null, void, and unenforceable."  (ECF No. 12 at 22 ¶ 64; see

ECF No. 55 at 30–32).   Mirror claims that Mr. Raviv fraudulently induced it to enter the

Employment Agreement "by omission because, during the entirety of the negotiations, he kept

[Mr.] Tan and [Mr.] Wallach, the only directors representing the shareholders, in the dark."

(ECF No. 55 at 30).  To establish fraudulent inducement under New York law—which Mirror

invokes (ECF No. 55 at 30)—Mirror must establish: "(1) a misrepresentation or omission of material fact; (2) which [Mr. Raviv] knew to be false; (3) which [he] made with the intention of inducing reliance; (4) upon which [Mirror] reasonably relied; and (5) which caused injury to [Mirror]." Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (per curiam) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996)).

Mirror has failed to establish fraud in the inducement as an affirmative defense because, as explained above, the evidence at trial showed that Mr. Tan and Mr. Wallach were, in fact, included in the negotiations, provided with at least one draft of what became the Employment Agreement, given advance notice that it was on the agenda for the Jan. 19 Meeting, voiced no questions or objections, and voted to approve the Employment Agreement at the Jan. 19 Meeting. (ECF Nos. 52 at 61–62; 56 at 11–20; PxY; PxZ; PxAA). Mr. Kanter copied both Mr. Tan and Mr. Wallach on the Jan. 13 Email, which attached and commented on the Revised Draft Employment Agreement. (PxY). Neither Mr. Tan nor Mr. Wallach communicated any questions or objections to Kanter in response to the Jan. 13 Email, in the days leading up to the Jan. 19 Meeting, nor at the Jan. 19 Meeting itself. (ECF No. 56 at 15, 17; PxAA). Furthermore, the evidence at trial established that Mr. Hart, Mirror's outside counsel, reviewed the Draft Employment Agreement, resulting in the Revised Draft Employment Agreement that Mr. Tan and Mr. Wallach received with the Jan. 13 Email. (PxY; PxAA at 2; PxJJ at AR-001423).

To counter this record, Mirror points only to Dr. Har-Noy's self-serving testimony that Mr. Wallach told him, after the fact, that he "absolutely" would not have voted in favor of the Employment Agreement if he had known that Dr. Har-Noy was not involved in the negotiations. (ECF No. 55 at 32 (citing ECF No. 56 at 161–62)). As an initial matter, Mr. Wallach's statement is

inadmissible hearsay, see Fed. R. Civ. P. 801(c), and Mirror offered no explanation for failing to bring Mr. Wallach to provide live testimony.  Furthermore, in the face of Dr. Har-Noy's subsequent disapproval of the Employment Agreement—after he and Mr. Raviv had their falling out on January 31, 2022—Mr. Wallach presumably needed to provide Dr. Har-Noy with some justification for his unambiguous vote in favor of the Employment Agreement.  Thus, even if Mr. Wallach's statement were admissible—which it is not—the Court finds it as lacking in credibility as Dr. Har-Noy's testimony.  Accordingly, even if Mr. Tan and Mr. Wallach were, as Mirror describes them, "the only directors representing the shareholders," (ECF No. 55 at 30), Mr. Raviv did not keep them "in the dark" about his Employment Agreement.

Finally, Mirror suggests that Mr. Raviv "hid the true status of the Company's prospects of an IPO led by Aegis."  (ECF No. 55 at 32).  The evidence shows the contrary.  On December 23, 2021, Aegis sent to Mr. Raviv the termination letter, which he circulated on December 27, 2021[31] to Dr. Har-Noy, Mr. Tan, Mr. Wallach, and Mr. Hart, as well as to Mr. Kanter, Ms. Lemerond, Ms. Swersky, and Dr. Cesano.  (PxQ at 000057).  Having been a participant in the "whole to do" with Mirror's outside auditor, Dr. Har-Noy similarly cannot disclaim knowledge that Mirror did not yet have audited financial statements, which were necessary for an IPO.  (ECF No. 52 at 28–29; 56 at 145–48).  Despite knowing that an IPO was not imminent, the Seven Member Board—including Mr. Tan and Mr. Wallach—approved Mr. Raviv's Employment Agreement.  (PxAA at 2).  Mirror has therefore failed to substantiate its contention that Mr. Raviv "hid the true status" of an IPO. (ECF No. 55 at 32).

---

[31] The days between December 23, 2021 and December 27, 2021 were the Christmas holidays.

Accordingly, Mirror has failed to show by a preponderance of the evidence that Mr. Raviv committed fraud in the inducement with respect to his Employment Agreement.

### c.  Mr. Raviv did not breach his fiduciary duties to Mirror.

As a final means to void the Employment Agreement, Mirror argues that Mr. Raviv breached his fiduciary duties to the Company in procuring the Employment Agreement.  (ECF Nos. 12 at 22 ¶ 65; 55 at 32–34).  Specifically, Mirror contends that Mr. Raviv breached his fiduciary duties when he:  (i) failed to disclose the contents of the Employment Agreement; (ii) engaged in self-dealing by negotiating with Mr. Kanter and others before they became directors and excluding Mr. Tan and Mr. Wallach; (iii) secured "disproportionally favorable" terms; and (iv) moved the proceeds of the Loo Transaction to the Chase Account.  (ECF No. 55 at 32–34).

To establish its affirmative defense of breach of fiduciary duty under Delaware law,[32] Mirror must establish "(i) the existence of a fiduciary duty and (ii) a breach of that duty."  Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 607 (S.D.N.Y. Aug. 30, 2011) (citing York Linings v. Roach, No. 1622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999) and Heller v. Kiernan, No. Civ. A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), aff'd, 806 A.2d 164 (Del. 2002)).  "Under Delaware law, directors and officers owe fiduciary duties of care, good faith, and loyalty."  Populus Media, Inc. v. Erb, No. 23 Civ. 4160 (MKV), 2024 WL 1313493, at *7 (S.D.N.Y. Mar. 26, 2024) (citing Gantler v. Stephens, 965 A.2d 695, 708–09 (Del. 2009)).

The Court infers from Mirror's characterization of Mr. Raviv's actions as "self-dealing" that it contends that his conduct breached his duty of loyalty.  (ECF No. 55 at 33–34).  "[T]he duty

---

[32] As Mirror is a Delaware corporation, Delaware law governs the analysis of Mirror's breach of fiduciary duty affirmative defense.  See Edgar v. MITE Corp., 457 U.S. 624, 645 (1982); Walton v. Morgan Stanley & Co., Inc., 623 F.2d 796, 798 n.3 (2d Cir. 1980).

of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Metro Storage Int'l LLC v. Harron, 275 A.3d 810, 842 (Del. Ch.), judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron, (Del. Ch. 2022). Corporate fiduciaries "are not permitted to use their position of trust and confidence to further their private interests." Id. "The duty of loyalty [also] includes a requirement to act in good faith, which is a subsidiary element, i.e., a condition of the fundamental duty of loyalty." Stone ex rel. AmSouth Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006) (cleaned up). "A failure to act in good faith may be shown, for instance, when the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation[.]" Disney II, 906 A.2d at 67 (cleaned up).

Applying Delaware's standard, for the same reasons discussed above, the Court finds that Mirror has failed to establish by a preponderance of the evidence that Mr. Raviv breached his fiduciary duties in negotiating the Employment Agreement, i.e., allegations (i), (ii), and (iii). (See §§ III.B.1.a–b, supra). See Wayne Cnty. Employees' Ret. Sys. v. Corti, No. 3534-CC, 2009 WL 2219260, at *11 (Del. Ch. Ct. July 24, 2009) (rejecting breach of fiduciary duty claim based on compensation awarded by employment agreements that company's board had approved).

As to allegation (iv)—that Mr. Raviv breached the duty of loyalty when he moved funds from the Loo Transaction to the Chase Account—the Court notes as an initial matter that Mirror does not provide any Delaware authority to support the legal conclusion that such an act by an officer or director per se breaches the duty of loyalty. (See ECF No. 55 at 34). Nor does Mirror point to any provision of the 2020 or 2021 By-Laws that required Mr. Raviv to inform the board of directors—at that time, the Three Member Board—or obtain its approval to open or transfer

funds to the Chase Account.  (Id.)  Although the 2020 and 2021 By-Laws vested funds custody in a CFO (PxYY at AR-000312 § 33; PxI at AR-015074), at the time, Mirror did not have a CFO—Dr. Har-Noy having apparently precipitated the prior CFO's resignation.  (ECF Nos. 52 at 29; 56 at 145–48).  Instead, Mirror engaged Brio to fill the functions of a CFO, and, consistent with the 2020 and 2021 By-Laws, Brio had access to the Chase Account.  (ECF No. 52 at 116–17; PxDDD).  Mr. Raviv therefore did not have exclusive control over the Chase Account, nor has Mirror shown that in opening the Chase Account Mr. Raviv "appear[ed] on both sides of the transaction or receive[d] a personal benefit not shared by all shareholders."  In re Walt Disney Co. Deriv. Litig., 907 A.2d 693, 751 (Del. Ch. 2005) ("Disney I"), aff'd, Disney II, 906 A.2d 27.  In addition, Mr. Raviv provided Ms. Bui—Dr. Har-Noy's wife, a non-employee who controlled the BoA Account (PxGGG at 0000872–73)—with the Chase Account information.  (Dx25 at 0000392).  Thus, neither the existence of the Chase Account nor the transfer of funds from the Loo Transaction were secret or surreptitious.  The facts that Mr. Raviv experienced months of delays in obtaining access to the BoA Account, arranged for Brio to have access to the Chase Account, and provided information about the Chase Account to Ms. Bui all evidence Mr. Raviv's good faith and "honesty of purpose" in opening the Chase Account in the first instance.  Disney I, 907 A.2d at 753.  Mirror has therefore not shown by a preponderance of the evidence that Mr. Raviv breached his duty of loyalty in opening the Chase Account.

Mirror also contends that Mr. Raviv breached his fiduciary duties in effecting the Chase Transfers because they "were self-interested and were not authorized by anyone at the [C]ompany."  (ECF No. 55 at 34).  As to the first transfer of $25,000 to reimburse expenses, Mirror introduced no evidence of a documented expense reimbursement policy with which Mr. Raviv

failed to comply and instead offered only the testimony of Ms. Bui that she typically reviewed expense reimbursements but had not done so for Mr. Raviv.  (ECF No. 58 at 25–26).  Ms. Bui admitted, however, that she was not actually aware "whether [the $25,000 payment] was an authorized payment or not[.]"  (Id. at 35).  Mr. Raviv credibly testified that at the time of the $25,000 transfer in December 2021, the expenses, including Brio's fees, capital equipment costs, and employees' travel expenses, had been incurred and he either had paid them on his personal credit card or reasonably expected to pay them.  (ECF No. 52 at 233–35).  While Mirror now disputes the expenses in hindsight—as with its other criticisms of Mr. Raviv's performance—the Court finds that Mirror has not shown that they were inappropriate, unreasonable, or excessive under the circumstances.  See Disney I, 907 A.2d at 714 n.133 (deeming "appropriate and reasonable," and therefore not a breach of fiduciary duties, expenses that executive incurred before he was hired but while he was performing "work either on behalf of the Company or in preparation for his tenure there").

As to the other three Chase transfers—$100,000 for the Loan, $100,000 for the Bonus, and $50,833.33 in Base Salary—each of these amounts was approved by the Seven Member Board (while Mr. Raviv was not present).  (PxR at AR-000016; PxZZ; ECF Nos. 52 at 119, 125; 56 at 39–40, 43–44).  Mr. Raviv therefore did not breach any fiduciary duty to Mirror in effecting these three transfers.  See Disney I, 907 A.2d at 709 n.88 (approving fee to director that was recommended by compensation committee and approved by full board in vote from which that director abstained).

Thus, the Court finds that Mirror has failed to prove by a preponderance of the evidence its affirmative defense that Mr. Raviv breached his fiduciary duties.[33]

*    *    *

Mirror has failed to establish, by a preponderance of the evidence, any of the asserted grounds for deeming the Employment Agreement "null and void." (ECF No. 55 at 30). Accordingly, the Employment Agreement is a valid and binding contract with which Mirror was required to comply.

### 2.  Mirror Breached the Employment Agreement.

Because the Employment Agreement is valid and binding, Mirror was required to comply with its terms in terminating Mr. Raviv's employment. See Brueckner, 2021 WL 2158733, at *4 (collecting cases). As detailed below, the Court concludes that Mirror failed to comply with the requirements of, and therefore breached, the Employment Agreement when it terminated Mr. Raviv as President and CEO.

### a.  Mirror has not shown cause for Mr. Raviv's termination.

Although Mirror contends that it terminated Mr. Raviv's employment for cause, it concedes—as it must—that neither the Feb. 24 UWC nor either of the Feb. 24 Letters stated that Mr. Raviv's "dismissal was for cause[.]" (ECF No. 55 at 36; see PxWW at AR-000107–08; PxXX; ECF No. 52 at 101–02). Instead, Mirror now contends that it terminated Mr. Raviv for "willful

---

[33] In its Answer, Mirror asserted other affirmative defenses, including excuse and unclean hands (ECF No. 12 at 22 ¶¶ 60–70), which Mirror has failed to argue in its post-trial submission (ECF No. 55), and is therefore deemed to have waived. See Lin v. Sessions, 681 F. App'x 86, 88 (2d Cir. 2017) (summary order); ("Issues not sufficiently argued in the briefs are considered waived[.]"); Wells Fargo Bank, N.A. v. 390 Park Ave. Assocs., LLC, No. 16 Civ. 9112 (LGS), 2018 WL 4373996, at * n.3 (S.D.N.Y. Sept. 12, 2018) (deeming waived affirmative defenses that defendant failed to argue in summary judgment briefing).

misconduct," and was thus "relieve[d] [] of any obligation to give him notice of his termination."
(ECF No. 55 at 36 (citing PxBB at 5 § 6.3)).  The purported "cause" to which Mirror now points are
"breaches of fiduciary duties, . . . breach of contract, misuse of corporate funds, acting without
authorization by the Company's Board of Directors, and other misconduct and wrongdoing[,]" as
stated by PAC in the Mar. 9 Email.  (ECF No. 55 at 36 (quoting Dx69)).  In support of its contention
that Mr. Raviv engaged in "willful misconduct," Mirror invokes the after-acquired evidence
doctrine and contends that "the facts it discovered afterward, including the details of his
surreptitious transfer of the Company's money, the concealment of his employment agreements,
and the takeover of the board by his allies, all [of] which was discovered once the Company took
control back from [him]," justified termination of his employment without notice.  (ECF No. 55 at
38; see id. at 37–38).

The after-acquired evidence doctrine permits an employer to invoke as a defense to a
wrongful termination claim "evidence of employee misconduct, such as criminal behavior,
employer rule infractions, malpractice and the like, of which the employer became aware only
after the employee's termination."  Ahing v. Lehman Bros., No. 94 Civ. 9027 (CSH), 2000 WL
460443, at *11 (S.D.N.Y. Apr. 18, 2000) (citing Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 147
n.17 (2d Cir. 1999)); accord Sanders v. Madison Sq. Garden, L.P., No. 06 Civ. 589 (GEL), 2007 WL
2254698, at *8–9 (S.D.N.Y. Aug. 6, 2007) ("In order to rely on the after-acquired evidence
doctrine, the employer must establish that the employee's wrongdoing was of such severity that
the employee would have been terminated for that reason alone if the employer had known it
at the time of discharge.") modified on reconsideration on other grounds, 525 F. Supp. 2d 364
(S.D.N.Y. 2007).  Explicit in the name of the doctrine is the requirement that the employer

discovered the evidence <u>after</u> termination, and the doctrine has no application where the employer possessed the information <u>before</u> termination.  <u>See</u> <u>Fitzpatrick v. Amer. Int'l Grp, Inc.</u>, No. 10 Civ. 142 (MHD), 2013 WL 709048, at *37 (S.D.N.Y. Feb. 26, 2018) (finding after-acquired evidence doctrine inapplicable where employer failed to show lack of awareness before termination of "same arguments that they are now pressing in support of [] their 'for cause' defense"), <u>mod.</u> <u>on</u> <u>reconsideration</u> <u>on</u> <u>other</u> <u>grounds</u>, 2013 WL 5427883 (S.D.N.Y. Sept. 27, 2013); <u>Ahing</u>, 2000 WL 460443, at *12 (finding after-acquired evidence doctrine inapplicable where employer "must have had knowledge of [the] evidence before plaintiff was terminated").

As the Court has detailed above, before terminating Mr. Raviv on February 24, 2022, Mirror was aware of each of the facts that it now claims as after-acquired evidence of his "willful misconduct."  (ECF No. 55 at 38).  First, not only did Brio—to whom Mirror had outsourced its CFO functions—have access to the Chase Account, but Mr. Raviv copied Dr. Har-Noy on his December 12, 2021 email to Ms. Bui in which he provided her with the Chase Account information and asked her to transfer the funds from the Loo Transaction.  (ECF No. 52 at 116–17; PxDD; Dx25 at 0000391–92).  Second, Mr. Raviv did not "conceal" his Employment Agreement from Mirror before his termination.  (<u>See</u> § II.G, <u>supra</u>).  Rather, Mr. Tan and Mr. Wallach were involved in the negotiation of the Employment Agreement beginning in November 2021, received on January 13, 2022 the Revised Draft Employment Agreement (the revisions of which were made by Hart, Mirror's outside counsel), were notified that it was on the agenda for the Jan. 19 Meeting, and were members of the validly-constituted Seven Member Board that voted to approve the Employment Agreement at that meeting.  (Dx22; PxY; PxZ; PxAA at 2; ECF Nos. 52 at 61–62; 56 at 11–20).  Third, Mr. Raviv informed Dr. Har-Noy of his board recruitment efforts,

discussed potential board memberships of Mr. Kanter, Dr. Cesano, and Ms. Lemerond, and Dr. Har-Noy in fact met with Ms. Lemerond and Mr. Kanter, whose directorships he supported, and suggested the nomination of Dr. Margolin.  (ECF Nos. 52 at 31–37; 56 at 137–38).  In the Dec. 13 Email, Mr. Raviv notified Dr. Har-Noy and others that Mr. Kanter had "agreed to become Chairman" and described Ms. Lemerond and Drs. Cesano and Margolin as potential new directors.  (PxP).  In the Dec. 28 Email, on which he copied Dr. Har-Noy, Mr. Raviv asked Mr. Kanter, Ms. Lemerond, and Dr. Cesano for biographies to be included in a press release "to announce [Mirror's] new expanded board."  (PxCCC).  In the Dec. 29 UWC, the Three Member Board—including Mr. Tan and Mr. Wallach—approved the appointments of Mr. Kanter, Ms. Lemerond, Ms. Swersky (who was replaced on Jan. 19 with Dr. Margolin), and Dr. Cesano as directors, and Mr. Kanter as Chair of the Seven Member Board, an achievement for which Dr. Har-Noy thanked Mr. Raviv.  (PxR; PxOO at AR 011565; PxAA at 1; ECF No. 56 at 186).  Mirror's suggestions that Mr. Raviv staged "a takeover" of the board, and that Dr. Har-Noy was unaware of the change in the composition of the board of directors, is therefore flatly contradicted by the record and, frankly, borders on frivolous.  Because Mirror was aware of all this evidence before Mr. Raviv's termination on February 24, 2022, the after-acquired evidence doctrine is inapplicable.

Even if another type of "cause" existed under section 6.3 of the Employment Agreement—which Mirror has not argued, let alone established by a preponderance of the evidence—Mirror's admission that it did not provide Mr. Raviv with notice and an opportunity to cure compels the conclusion that Mirror breached the Employment Agreement.  See Filmline, 865 F.2d 518 (holding that defendant's failure to provide notice and opportunity to cure required

by contract was "fatal" to its defense to breach of contract claim); <u>Brueckner</u>, 2021 WL 2158733, at *4–6 (holding that employer breached employment agreement by failing to provide notice and opportunity to cure in proper manner); <u>Mark IV</u>, 2013 WL 12310665, at *7–12 (holding that employer breached contract by failing to provide required notice and opportunity to appear and contest termination); <u>Ta-Chotani v. Doubleclick, Inc.</u>, 276 A.D.2d 313, 313 (1st Dep't 2000) (holding that employer's failure to comply with notice condition precedent in employment agreement precluded termination of employee for cause).

Accordingly, because the "willful misconduct" that Mirror seeks to characterize as "cause" is the same conduct that the Court has found constituted neither fraud in the inducement nor breaches of fiduciary duties, Mirror has failed to demonstrate by a preponderance of the evidence that it terminated Mr. Raviv for cause under the Employment Agreement. (<u>See</u> §§ III.B.1.b–c, <u>supra</u>). <u>See</u> <u>Tranium v. Rockwell Collins, Inc.</u>, No. 16 Civ. 7005 (JSR), 2018 WL 11220003, at *23–24 (S.D.N.Y. Feb. 26, 2018) (finding, after bench trial, that employer failed to meet burden of establishing by preponderance of the evidence that employee was terminated for cause).

### 3.  **Mr. Raviv Is Entitled to Some, But Not All, of the Damages He Seeks.**

The Court concludes that, because Mirror has failed to establish that it terminated Mr. Raviv for cause, the termination was <u>without</u> cause under the valid and binding Employment Agreement.  Mirror was therefore required to compensate Mr. Raviv in accordance with the Without Cause Provision but has not done so.  (PxBB § 7.2; ECF Nos. 52 at 20, 76–77, 145–46; 55 at 20).  Mirror is therefore in breach of the Employment Agreement and Mr. Raviv is entitled to damages under the Without Cause Provision.  <u>See</u> <u>Capuano v. Is. Comp. Prods, Inc.</u>, No. 03 Civ.

1572 (JBA), 2005 WL 8167300, at *13 (D. Conn. Mar. 22, 2005) (applying New York law and holding that employee established that employer terminated him without cause and therefore was entitled to damages under without cause provision of employment agreement); see also Emerald Adv., Inc. v. Incredibleart.com, Inc., 179 F. Supp. 2d 222, 229–30 (S.D.N.Y. 2001) (where contract was terminated "for reasons 'other than Cause,'" holding that defendants were jointly and severally liable for damages under without-cause provision).

A plaintiff who proves a breach of contract claim is "entitled to damages restoring the full benefit of the bargain," Kumiva Grp., LLC v. Garda USA Inc., 146 A.D.3d 504, 506 (1st Dep't 2017), meaning he is "entitled to be placed in the position [he] would have occupied had the contract been fulfilled according to its terms." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir. 2007) (applying New York law); accord Asesoral Bus. Ptrs., LLC v. Seatech Worldwide Corp., No. 19 Civ. 11512 (AJN) (SLC), 2021 WL 6755016, at *5 (S.D.N.Y. Dec. 16, 2021), adopted by, 2022 WL 1265945 (S.D.N.Y. Apr. 28, 2022); Tranium, 2018 WL 11220003, at *18.  Under New York law, "[t]he damages an employee is entitled to recover for breach of an employment agreement are the amount of wages and other benefits he[] would have received under the contract." Siegel v. Laris Enter. Corp., 307 A.D.2d 861, 862 (1st Dep't 2003).  If

> the non-breaching party has proven the fact of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damages is upon the wrongdoer.  Doubts are generally resolved against the party in breach.  Therefore, a plaintiff need only show a stable foundation for a reasonable estimate of the damages incurred as a result of the breach.  At that point, the burden of any uncertainty as to the amount of damages is on the breaching party.

Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016); see Tranium, 2018 WL 11220003, at *18–19 (resolving damages ambiguities against non-breaching party).

Post-trial, Mr. Raviv seeks three categories of damages: (i) $430,000.00, representing twelve months of Base Salary and a pro-rata bonus of $35,000.00 for the period January 1, 2022 through February 24, 2022 pursuant to sections 7.2(b) and (e); (ii) issuance of the 1,229 Stock Options on a fully-vested basis pursuant to the Raviv Consulting Agreement; and (iii) issuance of the 2,000 Grant Shares pursuant to the Employment Agreement.  (ECF No. 54 at 34; see PxBB §§ 7.2(b), (e); PxD § 5(b)).  Mirror does not specifically contest Mr. Raviv's calculation of the salary and bonus under sections 7.2(b) and (e) of the Employment Agreement, arguing only—without citation to any authority—that "[i]t is highly speculative to evaluate damages for private companies because they do not have a publicly traded stock value."  (ECF No. 55 at 42).  Neither party presented any expert testimony as to the value of the Stock Options or the Grant Shares.

The Court analyzes each of the three categories of damages that Mr. Raviv seeks.

### a.  Base Salary and Bonus

Because Mirror terminated him without cause, Mr. Raviv is entitled to "continued payments equal to the then current Base Salary . . . for twelve (12) months after the date of termination . . .[.]"  (PxBB § 7.2(e)).  Under the Employment Agreement, Mr. Raviv's Base Salary was $395,000.  (PxBB § 5.1).  Mr. Raviv appropriately seeks, and the Court awards, $395,000 in Base Salary under section 7.2(b) of the Employment Agreement.

Mr. Raviv also seeks an award of $35,000 representing a pro-rata bonus for the period from January 1, 2022 to February 24, 2022.  (ECF No. 54 at 34; see PxBB § 7.2(b)).  While he could receive "any Bonus amounts pro rata" in the event of termination without cause (PxBB § 7.2(b)), the Employment Agreement provided that Mr. Raviv was only "eligible to earn an annual bonus . . . in an amount determined by the Board based on the achievement of performance criteria

and objectives ('Goals'), which shall be mutually defined and agreed upon by the Board and [Mr.

Raviv] at the beginning of each fiscal year[,]" with the "initial Bonus target [] set at sixty percent

(60%)" of his Base Salary (the "Target Bonus"). (PxBB § 5.2 (emphasis added)). The word "Bonus"

in section 7.2(b) necessarily refers to the definition of "Bonus" in section 5.2, which clearly and

unambiguously made both the existence of the Goals and Mr. Raviv's "achievement" of them

prerequisites for the award of "any Bonus," including the Target Bonus. (PxBB §§ 5.2, 7.2(b)). An

award of a Bonus was therefore not automatic, but rather subject to the conditions precedent of

the existence and Mr. Raviv's achievement of the "Goals." See Wiggins v. Hain Pure Protein

Corp., 829 F. Supp. 2d 231, 240 (S.D.N.Y. 2011) (holding that executive was not entitled to bonus

where board of directors' "agree[ment] that he should be given the opportunity to receive a

bonus based on the company's performance and at the discretion of the [] [b]oard [was] not an

agreement to give [him] a specific bonus"); see also Lott v. Coreone Tech., LLC, No. 14 Civ. 5848

(CM), 2016 WL 462486, at *2, *12 (S.D.N.Y. Feb. 2, 2016) (finding that language in employment

agreement providing that employee was "eligible for an annual discretionary bonus" based on

meeting performance criteria approved by board of directors indicated bonus was not

guaranteed but rather discretionary); Kavitz v. Int'l Bus. Mach. Corp., No. 09 Civ. 5710 (CM) (RLE),

2010 WL 11507447, at *1–2, 7–8 (S.D.N.Y. Aug. 27, 2010) (denying employee's breach of contract

claim seeking bonus, which was predicated on his achievement of target performance metrics

and vested discretion in company whether to award any bonus); Valentine v. Carlisle Leasing Int'l

Co., No. 97 Civ. 1406 (RSP) (GJD), 1998 WL 690877, at *3–4 (N.D.N.Y. Sept. 30, 1998) (denying

employee's breach of contract claim seeking bonus where offer letter provided that "bonus will

be based upon both [his] individual performance as well as that of the business" and therefore,

company "retain[ed] absolute discretion to determine both whether [he] would receive a bonus and, if so, how much he would receive").

Mr. Raviv introduced no evidence demonstrating that he and the Seven Member Board discussed and agreed on the "Goals" that he needed to achieve to be "eligible" for a Bonus, let alone that he achieved any such "Goals."  (PxBB § 5.2).  Cf. Hallett v. Stuart Dean Co., 481 F. Supp. 3d 294, 304–05 (S.D.N.Y. 2020) (awarding executive "bonus . . . based upon the achievement of annual targets under a weighted plan" the profit and revenue targets for which were attached to employment agreement).  Even the Target Bonus was conditioned on Mr. Raviv's "achievement level with respect to the Goals."  (PxBB § 5.2).  Accordingly, because the Bonus was contingent on the existence of the Goals, which Mr. Raviv has failed to establish, and his achievement of those Goals, which he similarly failed to show, the Court concludes that he is not entitled to any Bonus award.

### b.  Stock Options

Mr. Raviv seeks "[i]ssuance [] of 1,229 Stock Options on a fully vested basis, pursuant to the exercise terms set forth in the [Raviv] Consulting Agreement (i.e., 5-year exercise window from May 5, 2021, and a strike price of $2,000)[.]"  (ECF No. 54 at 35; see ECF No. 1 at 10 (seeking an order "compelling Mirror to memorialize the fully vested Stock Options in accordance with the [Raviv] Consulting Agreement and the Employment Agreement[.]"))  As noted above, Mr. Raviv was eligible to receive the Stock Options in three tranches—230 between May 5, 2021 and October 5, 2021 (46 per month), 570 on the closing of the Bridge Financing Event, and 429 on an effective Registration Statement.  (PxD § 5(b)).  The latter two events did not occur, however. (ECF Nos. 52 at 156; 56 at 211–12).  While it was not incumbent on Mr. Raviv to guarantee that

these two events occurred, they were milestones, or conditions precedent, to awarding him additional Stock Options, and because they did not occur—for whatever reason—he is not entitled to receive the Stock Options the receipt of which was contingent.  See Valentine, 1998 WL 690877, at *6 (holding that employee was not entitled to bonus contingent "on his performance and that of the company").  The Employment Agreement did not specifically reference the Stock Options, providing only that the Raviv Consulting Agreement was terminated without releasing Mirror from its obligation to pay Mr. Raviv "all accrued compensation and benefits[.]"  (PxBB § 1.1).  Accordingly, only 230 of the Stock Options vested before the Employment Agreement effected the termination of the Raviv Consulting Agreement.  (Id.)  Mr. Raviv is therefore entitled to specific performance requiring Mirror to issue to him 230 Stock Options "on a fully diluted basis" at an exercise price of $2,000 per share and with an expiration date of five (5) years from the date of judgment.  (PxD § 5.2(b) & nn.1–2).  See Phlo Corp. v. Stevens, 62 F. App'x 377, 383 (2d Cir. 2003) (summary order) (affirming award of specific performance requiring defendant to issue shares to plaintiff pursuant to warrants).

### c.  **Grant Shares**

Mr. Raviv seeks the issuance of the Grant Shares, i.e., "2,000 shares of Mirror" referenced in the Employment Agreement.  (ECF No. 54 at 35; see PxBB § 5.4).  Like the Stock Options, the Grant Shares vested in tranches: 250 shares on the Effective Date of the Employment Agreement (January 19, 2022), 250 shares on January 19, 2023, and 500 shares each on January 19, 2024, January 19, 2025, and January 19, 2026.  (PxBB § 5.4).  In addition, the Employment Agreement provided that, in the event of termination without cause, Mr. Raviv was entitled to the "[i]mmediate vesting of all Grant Shares . . . which have not vested as of the date" of his

termination, i.e., February 24, 2022. (PxBB § 7.2(f)). Thus, unlike the contingent language of the Raviv Consulting Agreement with respect to the Stock Options, the Employment Agreement accelerated the vesting of the Grant Shares in the event of Mr. Raviv's termination without cause. Accordingly, Mr. Raviv is entitled to judgment requiring Mirror to issue to him 2,000 Grant Shares.[34]

### 4. Mr. Raviv Is Not Entitled to Attorneys' Fees and Costs.

The final form of relief Mr. Raviv seeks is attorneys' fees and expenses pursuant to Federal Rule of Civil Procedure 37(c)(2). (ECF No. 54 at 35). Mr. Raviv points to Mirror's denials of the RFAs and argues that he has proven that: (i) in the Dec. 29 UWC, the Three Member Board voted to expand to seven members, appointing Mr. Kanter, Ms. Lemerond, and Dr. Cesano as directors and Mr. Kanter as Chair; (ii) at the Jan. 19 Meeting, the Seven Member Board unanimously approved the Employment Agreement; (iii) the Jan. 19 Minutes accurately reflect what transpired at the Jan. 19 Meeting; and (iv) the Employment Agreement is valid and enforceable. (Id. at 35–36). Mr. Raviv contends—without citation to any precedential authority or elaboration—that "because none of the exceptions set forth in Rule 37(c) apply," he is entitled to recover his reasonable expenses. (Id. at 36).

---

[34] While Mr. Raviv did not expressly request an award of the Grant Shares in his Complaint (see ECF No. 1 at 10), the Court may award him the Grant Shares under Federal Rule of Civil Procedure 54(c), which permits the Court to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); see Pridgen v. Andresen, 113 F.3d 1230, 1230 (2d Cir. 1997) (noting "that Fed. R. Civ. P. 54(c) authorizes a court to grant full relief, even if that relief is not requested in the complaint"); Trapani v. Consol. Edison Emp. Mut. Aid Soc., Inc., 891 F.2d 48, 51 (2d Cir. 1989) ("A plaintiff is entitled to the relief justified by the facts proven at trial."); Juarez-Cardoso v. La Flor de Santa Ines, Inc., No. 15 Civ. 6671 (VMS), 2017 WL 4357009, at *20 (E.D.N.Y. Sept. 29, 2017) (after trial, awarding plaintiff additional "relief justified by the facts proven at trial and the applicable law" despite failing to mention it in her post-trial submission).

### a. **Legal Standards**

#### i. **Requests for Admission**

Federal Rule of Civil Procedure 36 provides that "[a] party may serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or to opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1)(A)–(B). "A request for admission pursuant to Federal Rule of Civil Procedure 36 is 'not a discovery device.'" In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig., No. 14 Md. 2542 (VSB) (SLC), 2020 WL 6290584, at *4 (S.D.N.Y. Oct. 27, 2020) (quoting T.Rowe Price Small-Cap Fund v. Oppenheimer & Co., 174 F.R.D. 38, 42 (S.D.N.Y. 1997)). Instead, an RFA is "a procedure for obtaining admissions for the record of facts already known by the seeker." Versatile Housewares v. SAS Grp., No. 09 Civ. 10182 (KMK) (PED), 2010 WL 11601225, at *1 (S.D.N.Y. July 15, 2010); see Rep. of Turkey v. Christie's Inc., 326 F.R.D. 394, 399 (S.D.N.Y. 2018) (explaining that RFAs "are used to establish admission of facts about which there is no real dispute"). Requests for admissions that "call for legal conclusions" are "manifest[]ly improper[.]" In re S.W. Bach & Co., No. 07-11569 (MG), 2010 WL 681000, at *4 (Bankr. S.D.N.Y. Feb. 24, 2010); see Versatile Housewares, 2010 WL 11601225, at *1 (noting that requests for admission that "call for bald legal conclusions have been ruled improper"). A party may therefore properly object to requests that "call[s] for a conclusion of one of the ultimate issues in the case, even if they related to facts of the case." S.W. Bach, 2010 WL 681000, at *4. A district court is "invested with substantial discretion under Rule 36 . . . to determine the propriety of" requests for admission. Dubin v. E.F. Hutton Grp., 125 F.R.D. 372, 373 (S.D.N.Y. 1989).

In responding to an RFA, "the answering party may admit or deny a request or 'state in detail why the answering party cannot truthfully admit or deny it.'"  Rep. of Turkey, 326 F.R.D. at 399 (quoting Fed. R. Civ. P. 36(a)(4)).  Rule 36 thus imposes on the responding party the "duty to make a reasonable inquiry to obtain information that assists a party to admit or deny a particular matter, or to state that the information readily available to the party is insufficient to enable the party to admit or deny the matter."  Billups v. West, No. 95 Civ. 1146 (KMW) (HBP), 1997 WL 100798, at *11 (S.D.N.Y. Mar. 6, 1997).

### ii.    Sanctions Under Rule 37(c)(2)

Federal Rule of Civil Procedure 37(c)(2) provides:

> If a party fails to admit what is requested under Rule 36 and if the requesting party late proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, in making that proof.

Fed. R. Civ. P. 37(c)(2).  The Court "must" award such expenses unless:

> (A) the request was held objectionable under Rule 36(a);

> (B) the admission sought was of no substantial importance;

> (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or

> (D) there was other good reason for the failure to admit.

Id.  "The 1970 Advisory Committee Notes for Rule 37 emphasize that the 'true test under Rule 37(c) is not whether a party prevailed at trial but whether he acted reasonably in believing that he might prevail.'"  Ohio Cas. Ins. Co. v. Twin City Fire Ins. Co., No. 14 Civ. 858 (NGG) (PK), 2020 WL 1698593, at *3 (E.D.N.Y. Apr. 8, 2020) (quoting Fed. R. Civ. P. 37(c) adv. cmte. n. (1970)).  "A party has 'reasonable ground' under Rule 37(c)(2)(C) to believe it might prevail at trial where

the admission requested involves a difficult factual question, or legal conclusions." Id. (collecting cases). "Only expenses that could have been avoided by an admission are recoverable pursuant to Rule 37(c)(2)." Id. A party's failure to identify which attorneys' fees and costs are properly attributable to the failure to admit precludes recovery. See id.

### b. Application

The Court finds that an award of expenses under Rule 37(c)(2) is not warranted because Mirror had reasonable grounds to deny the RFAs. Fed. R. Civ. P. 37(c)(2)(C). Each of the RFAs involved a fact that was highly contested before, during, and after trial, and Mirror "was entitled to cross-examine [] witnesses and challenge their credibility at trial" on these facts. Ohio Cas., 2020 WL 1698593, at *4 (denying request for Rule 37(c)(2) sanctions). As evidenced in this Opinion and Order, it was only after a three-day bench trial, post-trial submissions, and careful analysis that the Court's determination of the facts Mr. Raviv asked Mirror to admit in the RFAs has been possible. While the Court has ultimately deemed Dr. Har-Noy—who, essentially, "is" Mirror—not credible in many respects, that does not equate to a finding that Mirror lacked an evidentiary basis to deny the RFAs. See Zhejiang Tonxiang Imp. & Exp. Corp. v. Asia Bank, N.A., No. 98 Civ. 8288 (JSM), 2003 WL 21697893, at *1 (S.D.N.Y. July 21, 2003) (denying Rule 37(c)(2) sanctions where responding party had some factual basis for denying RFAs). Further, to the extent that the RFAs called for legal conclusions about the composition and authority of Mirror's Three and Seven Member Boards, as well as the validity of the Employment Agreement, they were objectionable. See Ohio Cas., 2020 WL 1698593, at *6 (declining to award Rule 37(c)(2) sanctions as to RFAs that "were objectionable because they sought admissions about conclusions

of law"); see also Coach, Inc. v. Horizon Trading USA Inc., 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (finding improper requests for admission that sought legal conclusions).

Accordingly, because Mirror had reasonable grounds to believe that it might prevail on the matters pertaining to the RFAs, the Court DENIES Mr. Raviv's request for reasonable expenses under Rule 37(c)(2).

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that Mirror is liable for breach of contract with respect to the Employment Agreement and awards Mr. Raviv a judgment:  (1) awarding him $395,000, and (2) directing Mirror to issue to him (a) 230 Stock Options "on a fully diluted basis" at an exercise price of $2,000 per share and with an expiration date of five (5) years from the date of judgment, and (b) 2,000 Grant Shares pursuant to the Employment Agreement. Mr. Raviv's request for sanctions under Federal Rule of Civil Procedure 37(c)(2) is DENIED.

The Clerk of the Court is respectfully directed to enter judgment awarding Mr. Raviv the relief specified above and to close this case.

Dated:      New York, New York
            May 31, 2024

                                          SO ORDERED.

                                          _____
                                          SARAH L. CAVE
                                          **United States Magistrate Judge**